UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| THE ARANSAS PROJECT, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. C-10-75 |
| | § | |
| BRYAN SHAW, *et al*, | § | |
| | § | |
| Defendants. | § | |

## ORDER

On this day came on to be considered: (1) Union Carbide Corporation's Motion to Intervene (D.E. 45);  (2) Texas Farm Bureau and American Farm Bureau Federation's Motion to Intervene (D.E. 51); (3) Texas Chemical Council's Motion to Intervene (D.E. 53); (4) Motion of San Antonio Water System for Leave to Intervene as Party Defendant, and Memorandum in Support (D.E. 59); and (5) CPS Energy's Motion to Intervene (D.E. 70).

For the reasons stated herein, the Court GRANTS Texas Chemical Council's Motion to Intervene (D.E. 53), but DENIES Union Carbide Corporation's Motion to Intervene (D.E. 45), Texas Farm Bureau and American Farm Bureau Federation's Motion to Intervene (D.E. 51), San Antonio Water System's Motion to Intervene (D.E. 59), and CPS Energy's Motion to Intervene (D.E. 70).

## I.      Jurisdiction

The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question), 16 U.S.C. §§ 1540(c) & (g) (the Endangered Species Act),[1] and 28 U.S.C. § 2201 (Declaratory Judgment Act).

---

[1] 16 U.S.C. § 1540(c) provides, "[t]he several district courts of the United States, including the courts enumerated in section 460 of title 28, shall have jurisdiction over any actions arising under this chapter," and Section 1540(g) provides for civil lawsuits under the Endangered Species Act.

## II.       Factual and Procedural Background

The Aransas Project (a non-profit corporation) brought this action on March 10, 2010 pursuant to the Endangered Species Act, 16 U.S.C. §§ 1540(c) & (g), against several Texas Commission on Environmental Quality ("TCEQ") officials (Bryan Shaw, Buddy Garcia, Carlos Rubinstein, and Mark Vickery) and the South Texas Watermaster (Al Segovia).   In essence, Plaintiff alleges that Defendants' failure to adequately manage the flow of fresh water into the San Antonio Bay ecosystem during the 2008-2009 winter resulted in a "tak[ing]" of Whooping Cranes, an endangered species, in violation of Section 9 of the Endangered Species Act ("ESA"), 16 U.S.C. § 1538(a)(1)(B).   Plaintiff argues that the reduced flow of fresh water into the ecosystem increased salinity, reducing the food and water supply for the Whooping Cranes, thus weakening and ultimately resulting in the death of twenty-three Whooping Cranes.  (D.E. 1 at 2, 8-24.)

Plaintiff requests declaratory and injunctive relief to ensure that the Whooping Cranes have sufficient water resources to prevent future "takings."   (D.E. 1 at 32-33.)   In essence, Plaintiff seeks a declaration that Defendants' actions resulted in a "taking" of Whooping Cranes in violation of Section 9 of the ESA, an injunction impacting current and future water diversions that result in takings of Whooping Cranes, and a court order requiring Defendants to develop a process to ensure that Whooping Cranes are protected.  (D.E. 1 at 32-33.)[2]

---

[2] More specifically, Plaintiff seeks, among other relief: (1) a declaration that Defendants have violated Section 9 of the ESA and continue to do so; (2) a declaration that water diversion regulations promulgated by Defendants are preempted by federal law when they purport to authorize water diversions that result in a taking of Whooping Cranes; (3) an injunction preventing Defendants from approving or allowing water diversions that destroy or alter the Whooping Crane habitat until the State provides reasonable assurances that such diversions will not take Whooping Cranes in violation of the ESA; (4) an injunction preventing Defendants from approving new water permits absent assurances that future water diversions will not take Whooping Cranes; (5) an order directing Defendants to develop a process for a complete accounting of all withdrawals from the Guadalupe and San Antonio River systems; (6) an order directing Defendants to conduct a through analysis of all permitted and exempted withdrawals and develop a water development and use plan sufficient to protect Whooping Cranes, "which may include reduction of existing water uses or addition of special conditions to existing permits."; and (7) an order

Union Carbide Corporation ("UCC") filed its Motion to Intervene on May 17, 2010. UCC seeks to intervene pursuant to Federal Rule of Civil Procedure 24(a)(2) or in the alternative Rule 24(b)(1)(B).  (D.E. 45.)[3]  On May 26, 2010 the Texas Farm Bureau ("TFB") and American Farm Bureau Federation ("AFBF") (collectively "TFB/AFBF") filed their Motion to Intervene (D.E. 51), as did the Texas Chemical Council ("TCC") (D.E. 53), also seeking intervention under Rule 24(a)(2) or Rule 24(b)(1)(B).  The San Antonio Water System ("SAWS") filed its Motion to Intervene on June 7, 2010.  (D.E. 59.)  The City of San Antonio, acting by and through the City Public Service Board, a Texas municipal utility ("CPS Energy") filed its Motion to Intervene on June 14, 2010.  (D.E. 70.)  Plaintiff is opposed to each intervention.  (D.E. 45 at 17; D.E. 51 at 21; D.E. 53 at 13; D.E. 59 at 19; D.E. 70 at 25.)   Plaintiff filed its Response to UCC's Motion to Intervene on June 1, 2010 (D.E. 58), and its Response to TCC's and TFB/AFBF's Motions to Intervene on June 16, 2010. (D.E. 74.)  The Court previously granted state agency Guadalupe-Blanco River Authority's ("GBRA") Motion to Intervene on April 23, 2010.  (D.E. 35.)

## III.   Discussion

### A.   Intervention under Rule 24(a)(2)

Federal Rule of Civil Procedure 24(a)(2), which governs intervention as of right, provides:

> On timely motion, the court must permit anyone to intervene who: (2) claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

directing plans to develop an approved Habitat Conservation Plan for the San Antonio and Guadalupe River basins and San Antonio Bay, "including provisions to reduce all withdrawals during low flow conditions to such an extent necessary to prevent" the taking of Whooping Cranes.  (D.E. 1 at 32-33.)
[3] On June 10, 2010, Movant UCC filed an Unopposed Motion for Leave to File Reply Brief in Further Support of its Motion to Intervene.  (D.E. 62.)  The Court GRANTS this Motion.

Fed. R. Civ. P. 24(a)(2).  Based upon this Rule, the Fifth Circuit has developed the following

four factor test in evaluating a motion to intervene under Rule 24(a)(2):

> (1) the applicant must file a timely application; (2) the applicant must claim an
> interest in the subject matter of the action; (3) the applicant must show that
> disposition of the action may impair or impede the applicant's ability to protect
> that interest; and (4) the applicant's interest must not be adequately represented by
> existing parties to the litigation.

Heaton v. Monogram Credit Card Bank of Georgia, 297 F.3d 416, 422 (5th Cir. 2002).

Generally, "[f]ederal courts should allow intervention where no one would be hurt and the

greater justice could be attained."  Id.

### B.    TCC Motion to Intervene (D.E. 53)

#### 1.    Background

According to its Motion, TCC is a statewide trade association of chemical manufacturing

facilities in Texas, many of which could be negatively affected by this lawsuit.  TCC seeks to

represent and protect the statewide chemical industry's common interest, and has a total of 68

member companies statewide, many of which rely upon fresh water for their daily operations.

(D.E. 53 at 1-3.)[4]  TCC member facilities acquire water rights either through their own state-

issued water rights permits that allow the facilities to divert water in specific amounts, or

alternatively they purchase water from another party who, in turn, possesses its own state-issued

water rights.  TCC states that the potential disruption of water supplies that could result from this

litigation would "virtually incapacitate [member] facilities."  (D.E. 53 at 2.)  The facilities most

directly affected include INVISTA S.a r.l. LLC ("INVISTA") (Victoria, Texas site), E.I. du Pont

de Nemours and Company ("du Pont") (Victoria, Texas site), INEOS (formerly BP Chemicals)

(Green Lake Plant), LyondellBasell Industries ("LyondellBasell") (Victoria, Texas site), and

---

[4] For a full list of TCC members, see http://www.txchemcouncil.org/categories/About-Us/Current-Members/.

UCC, as a wholly-owned subsidiary of Dow Chemical Company (Seadrift, Texas site).  TCC states that these facilities draw water from the Guadalupe River, and this litigation would affect 55,000 acre-feet of water per year   for INVISTA, 5,000 acre-feet/year for du Pont (water supplied by INVISTA), 3,226 acre-feet/year for INEOS (water supplied by GBRA), 8,597 acre-feet/year for LyondellBasell, and 10,000 acre-feet/year for UCC.  Together, these facilities hold the rights to approximately 68,226 acre-feet of water per year.  (D.E. 53 at 2-3.)  TCC argues that if the lawsuit were to succeed, it could result in significant reductions of water diversions for TCC member facilities, and possibly cause these facilities to reduce or discontinue operations altogether.  (D.E. 53 at 3-4.)

TCC argues that it should be allowed to intervene as a matter of right under Rule 24(a)(2) because its motion is timely, as it has known about its interest in this litigation only since this lawsuit was filed.  (D.E. 53 at 6-7.)  Second, TCC states that it has a strong interest in the subject matter of this litigation, as TCC member facilities have significant water rights, upon which they rely to conduct their operations.  (D.E. 53 at 7-8.)  Third, TCC claims that the relief Plaintiff seeks in this lawsuit, if granted, could result in serious and wide-ranging consequences for TCC members' water rights.  (D.E. 53 at 8.)  Finally, TCC states that its interests are not adequately represented by existing parties, as TCEQ officials are primarily concerned with their policy determinations and preservation of state-wide resources and GBRA is a governmental entity concerned with contractual commitments and the exercise of its own statutory authority.  Potential intervenor UCC, even though a member of TCC, represents only its own interests and not the overarching interests of TCC members as a whole.  (D.E. 58 at 9.)

The Court considers each of the Rule 24(a)(2) factors separately.

### 2. Application of Rule 24(a)(2) Factors

#### a. Timeliness

As an initial matter, the Court concludes that TCC's Motion to Intervene is timely, in light of all the factors outlined in Stallworth v. Monsanto Co., 558 F.2d 257, 263 (5th Cir. 1977).[5] This action was filed on March 10, 2010, and the Motion to Intervene was filed on May 26, 2010, approximately two and a half months later. The deadline for joinder of parties was June 15, 2010 (D.E. 32 at 2), and no other essential deadlines have yet passed in this case. Intervenor GBRA was granted permission to intervene on April 23, 2010, approximately one month before TCC filed its Motion. (D.E. 35.) Given the early stage of the proceedings, existing parties would not be unduly prejudiced by TCC's intervention, especially in light of the fact that the parties were aware of TCC's potential intervention as early as April 12, 2010, as stated in the Join Discovery / Case Management Plan. (D.E. 15 at 2 ("The state official defendants have heard that . . . the Texas Chemical Council may seek to intervene on the defense side.").) In contrast, TCC would be significantly prejudiced by not being allowed to intervene in a lawsuit that would have a direct impact on the water rights of its members. Finally, no unusual circumstances are present in this case that weigh for or against a determination of timeliness. TCC's Motion to Intervene is timely.[6]

#### b. Interest

The second factor under Rule 24(a)(2) requires that the movant "claim an interest in the subject matter of the action." Heaton, 297 F.3d at 422. To support intervention as of right, a

---

[5] The Stallworth factors are: (1) "[t]he length of time during which the would-be intervenor actually know[s] or reasonably should have known of his interest in the case before he petitioned for leave to intervene," (2) "[t]he extent of the prejudice that the existing parties to the litigation may suffer as a result of the would-be intervenor's failure to apply for intervention as soon as he actually knew or reasonably should have known of his interest in the case," (3) "[t]he extent of the prejudice that the would-be intervenor may suffer if his petition for leave to intervene is denied," and (4) "[t]he existence of unusual circumstances militating either for or against a determination that the application is timely." Stallworth, 558 F.2d at 264-66.
[6] Plaintiff does not dispute timeliness. (D.E. 74 at 3.)

movant must show that it has "a direct, substantial, legally protectable interest in the action, meaning that the interest be one which the substantive law recognizes as belonging to or being owned by the applicant." In re Lease Oil Antitrust Litig., 570 F.3d 244, 250 (5th Cir. 2009) (internal citations and quotation marks omitted). "[I]t is plain that something more than an economic interest is necessary." New Orleans Public Service, Inc. v. United Gas Pipe Line Co., 732 F.2d 452, 464 (5th Cir. 1984). The "'interest' test is primarily a practical guide to disposing of lawsuits by involving as many apparently concerned persons as is compatible with efficiency and due process." Sierra Club v. Espy, 18 F.3d 1202, 1207 (5th Cir. 1994).

As described above, TCC is a trade association composed of chemical manufacturing facilities in Texas. TCC has identified five such facilities, INVISTA, du Pont, INEOS, LyondellBasell, and UCC, which together hold the rights to approximately 68,226 acre-feet of water per year along waterways at issue in this litigation. (D.E. 53 at 3.)[7] TCC states that fresh water is "integral to the facilities' operations – that is, the facilities cannot operate without it." (D.E. 53 at 7.) This lawsuit directly impacts the water rights of these member facilities, and would likely impact their ability to operate, possibly resulting in the loss of jobs. (D.E. 53 at 7.) The Certificates of Interested Parties submitted by the TCEQ Defendants and Intervenor GBRA specifically identify certain TCC members as having a financial interest in the outcome of this litigation. (D.E. 14-1 (TCEQ Certificate identifying du Pont as financially interested)); D.E. 37 at 1-2, 4 (GBRA Certificate identifying BP Chemical (now INEOS), Dow Chemical Company, and UCC as financially interested).)

Plaintiff argues that neither TCC nor any of the other proposed intervenors have a direct, substantial, or legally protectable interest in this litigation. (D.E. 58 at 10, D.E. 74 at 3-5.)

[7] As detailed below, the interests of UCC even apart from other TCC members are far greater. Specifically, UCC together with GBRA co-owns an additional 162,501 acre-feet of water in the Lower Guadalupe River Segment. (D.E. 45 at 4-5.)

Plaintiffs essentially argue that as water is the property of the State of Texas, and water permit holders have only "usufructuary" rights (the right to use the property of another), water permit holders are not guaranteed use of the water.  (D.E. 58 at 10, D.E. 74 at 4-5.)  Under the Texas regulatory scheme, Plaintiff argues, the water use of permit holders is regulated by TCEQ Defendants.  This lawsuit is about the TCEQ Defendants' water management, not the water rights of any permit holders, Plaintiff contends.  (D.E. 58 at 11, D.E. 74 at 5.)  Plaintiff further argues that Movants lack an interest in this lawsuit because the lawsuit does not seek to take away water permits, but rather to have Defendants develop a "planning process . . . to fulfill their duties under the ESA."   Water permit holders can then participate in the development of procedures to protect the Cranes and ensure their own access to water.  (D.E. 58 at 11-12, D.E. 74 at 2.)

The Court concludes that TCC's members have a legally protectable interest in this litigation.  While Texas law provides that water "is the property of the state," Tex. Water Code § 11.021(a), it recognizes the property rights of users, even if subject to the State's ownership. Section 11.022 of the Texas Water Code provides, "[t]he right to the use of state water may be acquired by appropriation in the manner and for the purposes provided in this chapter. When the right to use state water is lawfully acquired, it may be taken or diverted from its natural channel." Id. § 11.022.   State water may be appropriated many different reasons, including for any "beneficial use."  Id. § 11.023(a), (b).  State law also provides that the "right to use state water under a permit or certified filing  is limited not only to the amount specifically appropriated but also to the amount which is being or can be beneficially used for the purposes specified in the appropriation, and all water not so used is considered not appropriated."  Id. § 11.025.  Water rights are not "perfected unless the water has been beneficially used for a purpose stated in the

original declaration of intention to appropriate water or stated in a permit issued by the commission or one of its predecessors." Id. § 11.026. "As between appropriators, the first in time is the first in right." Id. § 11.027. Notably, Texas law provides that "[w]hen an appropriator from a source of water supply has used water under the terms of a certified filing or a permit for a period of three years, he acquires title to his appropriation by limitation against any other claimant of water from the same source of water supply and against any riparian owner on the same source of water supply." Id. § 11.029. Conversely, "[i]f any lawful appropriation or use of state water is wilfully abandoned during any three successive years, the right to use the water is forfeited and the water is again subject to appropriation." Id. § 11.030. Texas water law also recognizes that state and local governments "have the power of eminent domain." Id. § 11.033.

Texas courts have recognized that perfected water rights are vested property rights under Texas law. See Texas Water Rights Comm. v. Wright, 464 S.W.2d 642, 647 (Tex. 1971) ("[A] matured appropriation right to water is a vested right. However, the right which one obtains by a water permit for appropriated waters is a right which is limited to beneficial and non-wasteful uses."); In re Contests of City of Eagle Pass, to Adjudication of Water Rights in Middle Rio Grande Basin and Contributing Texas Tributaries, 680 S.W.2d 853, 858 (Tex. App. – Austin 1984) ("The owner of a certified filing has the right to all of the water appropriated which may be used in a beneficial and nonwasteful manner."). The relevant provisions of the Texas Water Code and case law demonstrate that water users do have important legal rights, which are directly at issue in this litigation. Even if those water rights are subject to control by the state, or may be lost over time, this does not alter the conclusion that water rights holders, such as TCC members, have legally protectable rights in the water at issue in this litigation.

As a related issue, although Plaintiff argues that it only seek a "process" to protect the Whooping Cranes during water shortages, and do not seek to directly affect water rights, the Complaint demonstrates that far more is at stake.  For example, Plaintiff requests that this Court (1) "[e]njoin Defendants . . . from **approving or allowing water diversion activities** that destroy or alter Whooping Crane habitat until the State provides reasonable assurances that State-authorized water diversion activities will not take Whooping Cranes in violation of the ESA," (2) "[o]rder Defendants to conduct a thorough analysis of all permitted and exempt withdrawals and develop a binding plan for water development and water use in the San Antonio and Guadalupe River basins sufficient to protect Whooping Cranes and their vital habitat, **which may include reduction of existing water uses or addition of special conditions to existing permits**," and (3) "[o]rder Defendants to develop an approved Habitat Conservation Plan for the San Antonio and Guadalupe River basins and San Antonio Bay, **including provisions to reduce all withdrawals during low flow conditions** to such an extent necessary to prevent harm and harassment of the Aransas-Buffalo Wood Whooping Crane flock." (D.E. 1 at 33 (emphasis added).)  As the requested relief demonstrates, the interests of water users are directly at issue in this litigation.  A natural consequence of increased water flows to the Whooping Crane habitat will be a decrease in water for other users.  Plaintiff in fact acknowledges that it "ultimately seek[s] water for the Cranes when they face a crisis . . ., and the process TAP seeks could ultimately lead to reductions in available water to other users . . . ."  (D.E. 74 at 2.)

Thus, water rights holders, including TCC members, have direct, substantial, and legally protectable interests in the action.  In light of the significant impact this lawsuit may have upon TCC member companies' operation, the Court concludes that TCC has sufficient interest in the subject matter of this litigation.  See Sierra Club v. Espy, 18 F.3d 1202, 1207 (5th Cir. 1994)

(ruling that forest products industry representatives could intervene in environmental lawsuit against the U.S. Forest Service, as they had a "legally protectable property interests in existing timber contracts that are threatened by the potential bar on even-aged [logging] management.").

### c.      Impairment

The third factor for intervention under Rule 24(a)(2) requires that the movant "show that disposition of the action may impair or impede the applicant's ability to protect [its] interest" in the subject matter of the litigation.  Heaton, 297 F.3d at 422.  Rule 24(a)(2) does not require "a showing by the applicant for intervention that he will be bound by the disposition of the action. The current practical impairment standard represents a liberalization of the prerequisites to intervention. . . . [T]his more generous measure of impairment favors would-be intervenors." Edwards v. City of Houston, 78 F.3d 983, 1004-05 (5th Cir. 1996) (internal citations omitted). Plaintiff here argues that the lawsuit will not invalidate existing water permits held by TCC members, as it seeks only a process to ensure compliance with the ESA, not a reallocation of TCC members' water rights.  (D.E. 74 at 5-6.)

As the Court has discussed above, disposition of this action may impair or impede TCC members' water rights.   Plaintiff seeks both declaratory and injunctive relief that could considerably alter water rights in Texas, and would impact a basic resource upon which TCC members and others rely for their central operations.  The third factor is easily satisfied.

### d.      Adequate Representation

The final factor under Rule 24(a)(2) is that the movant's "interest must not be adequately represented by existing parties to the litigation."  Heaton, 297 F.3d at 422.  The showing for this final factor is "treated as minimal."  Trbovich v. United Mine Workers of Am., 404 U.S. 528,

538 n.10 (1972). "The burden of establishing inadequate representation is on the applicant for intervention." Edwards, 78 F.3d at 1005.

Plaintiff argues that any interest TCC has, as a collection of water permit holders, is adequately represented by the existing parties to this litigation. Specifically, it argues that the TCEQ Defendants are presumed to adequately represent the interests of their regulated community, as they want to protect the current regime. Further, GBRA provides an additional voice as both a water permit holder and an entity with some governmental authority. (D.E. 74 at 7.) Because water regulators and a permit holder are already parties to this litigation, TCC's interests are adequately represented, Plaintiff concludes. (D.E. 74 at 7.)

It is apparent that Plaintiff does not represent TCC's interests. Whether the TCEQ Defendants or Intervenor GBRA can adequately represent TCC's interests, however, requires a closer inquiry.

In similar environmental cases, the Fifth Circuit has repeatedly held that governmental defendants cannot adequately represent the interests of private parties (and vice versa), as the interests of governmental and private entities often diverge.[8] For example, in Sierra Club v. Espy, a case brought against the United States Forest Service relating to logging procedures, the Fifth Circuit allowed the intervention of two trade associations representing timber purchasers. The court rejected the plaintiff's argument that "the government adequately represents the movants' interest because the interests are essentially identical." 18 F.3d at 1207. Rather, the court explained, "the movants have demonstrated . . . that the government's representation of

---

[8] As Plaintiff notes (D.E. 74 at 7), the Fifth Circuit in Hopwood v. State of Texas, 21 F.3d 603 (5th Cir. 1994) stated, "[w]here the party whose representation is said to be inadequate is a governmental agency, a much stronger showing of inadequacy is required. In a suit involving a matter of sovereign interest, the State is presumed to represent the interests of all of its citizens." 21 F.3d at 605. Hopwood, however, was a Section 1983 action challenging an affirmative action policy, not an environmental case. More recent Fifth Circuit precedent involving ESA causes of action and other environmental cases, as discussed herein, have specifically concluded that governmental parties cannot adequately represent particular private interests. These precedents are more closely on point than is Hopwood.

their interest is inadequate. The government must represent the broad public interest, not just the economic concerns of the timber industry. Given the minimal burden on the movants to satisfy this requirement, we conclude that the government's representation of the intervenors' interest is inadequate." Id. at 1207-08.  The Fifth Circuit reached a similar conclusion in Sierra Club v. City of San Antonio, 115 F.3d 311 (5th Cir. 1997), an Endangered Species Act case wherein the Sierra Club alleged that certain entities that withdrew water from the Edwards Aquifer were causing harm to and "taking" threatened and endangered species living in the Comal and San Marcos Springs.  115 F.3d at 313.  In considering the State of Texas's motion to intervene, the court rejected the Sierra Club's argument that the State's interests were adequately represented by private and local government parties, explaining "[i]t is axiomatic that the interests of the pumpers, who are local cities, businesses, and governmental entities that rely on the aquifer's water supply for their immediate subsistence, will diverge from those of the various state agencies who are charged with taking a state-wide view of the aquifer as it affects wildlife, water resources and quality, and the agricultural industry, as well as those of the state qua state and as parens patriae." 115 F.3d at 315.  As another example, the Fifth Circuit in Sierra Club v. Glickman allowed AFBF to intervene as of right in an environmental suit against the U.S. Department of Agriculture ("USDA").  82 F.3d 106, 110 (5th Cir. 1996).  The court explained, "we disagree with the district court that the USDA will adequately represent the AFBF members' interests. . . . [T]he government must represent the broad public interest, not just the economic concerns of [one] industry.  For this reason alone, the interests of AFBF members will not necessarily coincide, even though, at this point, they share common ground. . . ." Id. (citing Espy) (internal quotation marks omitted). The Fifth Circuit has applied the same rationale in other intervention cases.  See Heaton, 297 F.3d at 425 ("Government agencies such as the FDIC

must represent the public interest, not just the economic interests of one industry.  That the FDIC's interests and [the defendant's] may diverge in the future, even though, at this moment, they appear to share common ground, is enough to meet the FDIC's burden on the [fourth factor of Rule 24(a)(2)]."); John Doe No. 1 v. Glickman, 256 F.3d 371, 381 (5th Cir. 2001) (allowing intervention under Rule 24(a)(2) and stating, "[t]he USDA is a government agency that must represent the broad public interest, not just the [Animal Protection] Institute's concerns.  Given the Institute's minimal burden and USDA's duty to represent the broad public interest, not just the Institute's, we conclude that USDA's representation of the Institute may be inadequate.").

The same principle must apply here.  Movant TCC, as a membership association composed of private chemical manufacturing facilities, cannot be adequately represented by Defendant TCEQ officials and state agency GBRA, whose ultimate interests as governmental actors vary significantly from that of consumers and industrial water users.  The Court has already recognized that the TCEQ Defendants are "primarily concerned with defending their policy determinations and protecting the State's resources on a larger level," and that GBRA would be focused mainly on its "numerous contractual commitments [and] the exercise of [its] statutory authority."  (D.E. 35 at 4.)  These interests are different from those of end-users, whether private or commercial, who must focus on ensuring that they continue to receive their allocated water rights without the alterations that Plaintiff seeks to secure.

Given the significant impact this litigation may have upon water users in the region, the Court find that it is necessary to ensure that the interests of private consumers are adequately represented in this litigation.  TCC, as a membership association composed of 68 large

consumers, most notably five users that together hold the rights to approximately 68,226 acre-feet of water per year,[9] is a logical choice to represent the interests of private users.

In light of this discussion, the Court concludes that the factors under Rule 24(a)(2) strongly favor granting TCC's Motion to Intervene.  While TCC has not formally complied with Rule 24(c), which states that a motion to intervene must "be accompanied by a pleading that sets out the claim or defense for which intervention is sought," this requirement has been liberally construed.  The Fifth Circuit has allowed interventions even in the absence of a formal motion to intervene, Farina v. Mission Inv. Trust, 615 F.2d 1068, 1074 (5th Cir. 1980), and courts in this District have taken a lenient approach to Rule 24(c).  See Liberty Surplus Ins. Companies v. Slick Willies of Am., Inc., 2007 WL 2330294, at *1-2 (S.D. Tex. Aug. 15, 2007) ("[T]he motion to intervene . . . does put the parties on notice of his grounds for intervention.  The motion is timely filed.  [Plaintiff] does not contend that it would be prejudiced by the intervention.  The failure to comply with Rule 24(c) is not a sufficient basis to deny the motion to intervene."); Doctors Hosp. 1997 LP v. Beazley Ins., 2009 WL 3719482, at *4 (S.D. Tex. Nov. 3, 2009) (allowing intervention without a written motion); see also City Bank v. Compass Bank, 2010 WL 1424275, at *7 (W.D. Tex. Apr. 6, 2010) ("[T]he Court adopts a 'lenient approach' to this issue, finding that it can resolve the basic question of Miller's standing to intervene, given the present record, and have the required Rule 24(c) pleadings filed at a later time.").  Here, TCC has presented the interests it seeks to protect, and clearly indicates its position in this litigation.  It also states that it supports the Motions to Dismiss filed in this action, and that it intends to file its own Rule 12 motion.  (D.E. 53 at 12.)  Finally, TCC states that it is prepared to file all required

---

[9] As noted previously, this interest is even greater, as UCC (a member of TCC) represents that it alone has an interest in 162,501 additional acre-feet of water.  (D.E. 45 at 4-5.)  TCC members' interest in this litigation is thus substantial.

documents promptly after entry of an order allowing its intervention.  (D.E. 53 at 12.)  This is sufficient to satisfy the requirements of Rule 24(c).

In sum, the Court concludes that Movant TCC shall be permitted to intervene as of right under Federal Rule of Civil Procedure 24(a)(2), and therefore GRANTS its Motion to Intervene. (D.E. 53.)  In light of this conclusion, the Court now turns to UCC's, TFB/AFBF's, SAWS's, and CPS Energy's Motions to Intervene.  (D.E. 45, 51, 59, 70.)

### C.    UCC, TFB/AFBF, SAWS and CPS Energy's Motions to Intervene (D.E. 45, 51, 59, 70)

#### 1.    Background on Movants

##### a.    Union Carbide Corporation

Movant UCC operates an integrated chemical manufacturing complex located near Seadrift, Texas (the "Seadrift Plant").   The Seadrift Plant is located on 4,700 acres and produces "building-block chemicals that serve as the precursors to many specialty chemical products critical to numerous industries," such as plastics, containers, toys, and health and beauty products.  UCC utilizes fresh water in the production of its products at the Seadrift Plant.  (D.E. 45 at 3.)  UCC states that it has significant water rights from the Guadalupe River Basin dating from the 1940s, and provides an extensive review of its water rights over the past several decades.  (D.E. 45 at 3-5.)

Under a September 2002 Agreement between UCC and the GBRA, UCC has a "significant interest" in 172,501 acre-feet of water per year from the Guadalupe River Basin. (D.E. 45 at 5.)  Specifically, under the September 2002 Agreement, UCC has (1) "perpetual right to use for consumptive purposes up to 10,000 acre-feet of water per year," which includes the right to sell any portion of this allotment to a third party, and (2) "perpetual right to use 20,000 acre-feet of water for consumptive purposes in the UCC Seadrift Plant and an additional 10,000

acre-feet of water if needed." (D.E. 45 at 5.)  In addition, under a revenue sharing section of the September 2002 Agreement, for any amount of water co-owned by GBRA, UCC receives a share of revenues received from sales.  UCC receives 28.4% of all revenues from GBRA's sale of co-owned Run-of-the-River Rights under Section 3.6 of the 2002 Agreement.  (D.E. 45 at 5.) Beyond direct water rights, UCC states that it plays an important planning role in the Guadalupe River Basin.  (D.E. 45 at 6-7.)

UCC identifies two "direct, substantial, and legally protectable" interests in this litigation. First, as it has sole ownership rights over 10,000 acre feet of water per year and co-ownership rights over 162,501 additional acre-feet per year, it is one of the largest water rights holders on the Guadalupe River Basin and this legally protectable interest is a direct target of the current litigation.  Second, the lawsuit threatens UCC's contracts with the GBRA.  Under agreements with the GBRA, UCC is allotted significant additional acre-feet of water, in addition to water it directly owners, and UCC directly benefits from water sold by the GBRA pursuant to revenue sharing provisions within its contract with the GBRA.  (D.E. 45 at 11.)

### b.    Texas Farm Bureau and American Farm Bureau Federation Background

Movant TFB describes itself as "a non-profit membership association representing family farmers and ranchers in Texas," with over 422,159 members, and a particular interest in water rights.  (D.E. 51 at 6.)  Among its members include persons holding water rights granted by the State of Texas to divert and use water from the Guadalupe River Basin and San Antonio River Basin, both of which are at issue in Plaintiff's Complaint.  TFB has several different groups of members that have an interest in this litigation: (1) permit holders in the Guadalupe and San Antonio River Basins, with TFB members representing "over 11% of the total permit holders and 18% of the irrigation permit holders"; (2) exempt users, who utilize water for domestic and

livestock use; and (3) persons who pump underground water from the Edwards Aquifer, which feeds the San Marcos and Comal Springs, which in turn provide flows to the San Marcos and Comal Rivers, both of which are major tributaries of the Guadalupe River.  (D.E. 51 at 6-8.)  For each group, this suit and Plaintiff's requested relief would "directly and adversely affect the rights and the economic and personal well-being of TFB members."  (D.E. 51 at 7.)

For its part, the AFBF states that it is the nation's largest non-profit general farm organization, of which the TFB is a member.  AFBF represents its members in legal, regulatory, and legislative matters relating to the ESA.  (D.E. 51 at 9.)  As TFB is a member of AFBF, TFB's members are also members of the AFBF.  AFBF argues that its members have a direct interest in this suit because Plaintiff's claims, if acknowledged, could have "the potential to apply to virtually every water course or other body of water in the country from which farmers or ranchers have legally recognized rights to withdraw or divert, and use, water for irrigation, livestock, or domestic purposes, if that water resource contributes . . . to the habitat of any listed species." (D.E. 51 at 9.)

c. **San Antonio Water System**

The San Antonio Water System, or SAWS, is a public agency of the City of San Antonio, Texas, providing water services to approximately 1.3 million people.  SAWS is a single utility responsible for water, wastewater, and water reuse.  SAWS's water and wastewater service areas are established by the TCEQ, acting through Defendants Brian Shaw, Buddy Garcia, and Carlos Rubenstein.  SAWS serves retail customers and provides wholesale water supplies to several smaller utility systems within its territory.  TCEQ issues SAWS's permits to discharge treated wastewater into tributaries of the San Antonio River and regulate all aspects of SAWS's

wastewater gathering and treatment system.  SAWS's authority to collect and treat wastewater and redistribute that reclaimed water for use is also established by TCEQ.  (D.E. 59 at 4.)

SAWS identifies itself as a state and national leader in water conservation efforts.  As the agency responsible for ensuring the water needs of the growing San Antonio metropolitan area, SAWS states that it must develop up to 141,000 acre-feet of new water supplies by 2060.  To do so, it has continued to develop new water supplies.  Notably, it has developed surface water supplies from the Guadalupe and San Antonio Rivers.  (D.E. 59 at 5.)

SAWS states that it holds in excess of 23,000 acre-feet of surface water rights in the San Antonio River Basin under permits issued by TCEQ that would be directly affected by this lawsuit.  An additional 40,00 acre-feet of treated wastewater that SAWS discharges from its water recycling plant into a San Antonio River tributary is subsequently withdrawn for cooling purposes by CPS Energy, San Antonio's municipally owned gas and electric utility.  (D.E. 59 at 5.)  This withdrawal is pursuant to a TCEQ permit that CPS holds, but is conditioned on CPS Energy's contract with SAWS.  (D.E. 59 at 5.)

SAWS explains that it gets most of its water supply from groundwater withdrawn from the Edwards Aquifer pursuant to permits issued by the Edwards Aquifer Authority.  Although Plaintiffs sue only TCEQ officials responsible for surface water, the broad relief Plaintiff seeks could "if construed broadly, wind up implicating groundwater use as well as surface-water rights and permits issued by Defendants."  (D.E. 59 at 6.)  The relief sought would also diminish the availability of surface water supplies to all users throughout the region, SAWS argues.  (D.E. 59 at 6.)

### d.     CPS Energy

According to its Motion, CPS Energy is the exclusive provide of electrical services to over 1.7 million people in the San Antonio area, including residential, commercial, and industrial users.  It owns and operates two power plant complexes in Bexar County situated on large reservoirs, which provide over 60% of CPS Energy's generation capacity.  These power plants rely upon an adequate and reliable water supply to operate, primarily for condenser cooling. CPS Energy owns permitted water rights that authorize diversions from the San Antonio River basin sufficient to meet CPS  Energy's water needs.  Without sufficient water, CPS Energy states that several electrical generating units would cease to operate, impairing its ability to provide electrical service to the greater San Antonio population.  (D.E. 70 at 1-3.)

CPS Energy is owned by the City of San Antonio and managed independently by a Board of Trustees.  CPS Energy has permits to divert and use up to 37,000 acre-feet of water per year from Calaveras Lake, diverted from the San Antonio River basin, with some additional permitted withdrawals.  (D.E. 70 at 3-4.)

### 2.     Application of Rule 24(a)(2) Factors

Without the need for extensive analysis, the Court can conclude that Movants UCC, TFB/AFBF, SAWS, and CPS Energy satisfy the first three elements for intervention under Rule 24(a)(2).  The Motions are timely, having been filed approximately three to four months after initiation of this action and before any important deadlines in this action;[10] UCC, TFB/AFBF, SAWS, and CPS Energy claim an interest in the subject matter of this action because of the water rights it or its members possess; and all have shown that disposition of this action would impair their ability to protect existing water rights.  The difficulty arises, however, with respect

---

[10] Plaintiff does not dispute timeliness, at least with respect to UCC's Motion to Intervene.  (D.E. 58 at 9.)

to the final factor under Rule 24(a)(2), namely that "the applicant's interest must not be adequately represented by existing parties to the litigation." Heaton, 297 F.3d at 422.

As an initial matter, the Movants make much of the factual distinctions between themselves and the existing parties to this litigation, but fail to identify specific legal arguments or positions that they alone would take. Indeed, three motions to dismiss have already been filed in this action, totaling approximately sixty-five pages of briefing, in addition to exhibits totaling hundreds of pages. (D.E. 40, 43, 57.) These motions to dismiss raise numerous arguments, including lack of standing, failure to state a claim, Eleventh Amendment immunity, Fifth Amendment takings considerations, and abstention pursuant to Burford v. Sun Oil Co., 319 U.S. 315 (1943). TCC states that it will join in these motions, and "will file a Rule 12 motion and other pleadings, seeking to dismiss Plaintiff's claims and asserting the position that the relief [Plaintiff] seeks would wrongfully invalidate its members' vested rights." (D.E. 53 at 12.) One party has already submitted an amicus curiae brief. (D.E. 72.) The significant briefing already filed with the Court indicates that the Movant's interests will be adequately represented by the existing parties. None of the Movants have suggested that the briefing already filed with the Court fails to adequately represent their interests.

Turning now to Movants UCC and TFB/AFBF, the Court concludes that the newly allowed intervention of TCC will ensure that the interests of private consumers are adequately represented. TCC will adequately represent UCC's interests, as UCC is a member of TCC, and as an industrial operation, UCC has interests very similar to that of other TCC members. (D.E. 53 at 9.) In fact, TCC identifies UCC's Seadrift Plant as one of the five largest users affected by this litigation. (D.E. 53 at 3.) With respect to the interests of TFB/AFBF, the Court concludes that TCC and TFB/AFBF are similar in that both are membership associations representing water

consumers.  Even though TCC and TFB/AFBF members use their water rights for different purposes, both have substantially similar interests as private users of water, namely ensuring their continued water rights and preventing any alteration thereof.

While it is true that both UCC and TFB/AFBF filed their Motions to Intervene before TCC, both were alerted to TCC's possible intervention in the Joint Discovery / Case Management Plan filed in this case.  (D.E. 15 at 2.)  Despite the opportunity to address whether TCC could adequately represent their interests, neither party chose to do so.  Moreover, UCC cannot seriously contend that its own interests will not be adequately represented by TCC, an industry association of which it is a member. TFB/AFBF, when given the opportunity to argue against UCC's intervention, failed to offer any argument other than the fact that its "interests are to protect water rights which are primarily for 'consumptive industrial use.'"  (D.E. 51 at 17.)  Although UCC and other TCC members' uses of the water at issue differs from that of TFB/AFBF members, the Court fails to see the relevance of this difference, particularly as it relates to representation of user interests in this litigation.  Taken to its logical conclusion, TFB/AFBF's argument would require the Court to allow any party to intervene so long as its interests differed in any way from the parties already in the lawsuit.[11]

Next, with respect to SAWS and CPS Energy, the Court concludes that the combined representation of the TCEQ Defendants, GBRA, and TCC will adequately protect SAWS and CPS Energy's interests.  In its Motion to Intervene, SAWS argues that its position in this case would be "unique," as unlike other entities, its "interests are precariously balanced between the San Antonio River Basin and the Guadalupe River Basin, and the environmental needs of both."

---

[11] In support of its Motion, TFB/AFBF cites Sierra Club v. Glickman, 82 F.3d 106 (5th Cir. 1996), wherein AFBF was allowed to intervene. This case, however, is distinguishable.  As noted above, the Fifth Circuit in Glickman allowed AFBF to intervene because the USDA was the only named defendant, and the court explained that the government could not adequately represent private interests. 82 F.3d at 110.  Here, however, TCC has been granted the right to intervene, and will adequately represent non-governmental users of water at issue in this case.

(D.E. 59 at 14.)    SAWS further argues that the "far-reaching impact of the relief sought by [Plaintiff] could negatively affect" SAWS's reclaimed water program "to the detriment of SAWS and other environmental interests, including the very species at issue in this lawsuit."  (D.E. 59 at 14.)    Similarly, CPS Energy argues that TCEQ Defendants cannot represent their interests because Defendants' interests "are much broader" and they cannot "look out for the particular and critical interests of CPS Energy."  (D.E. 70 at 19.)  CPS further argues that GBRA will not represent its interests because its statutory authority does not extend to the San Antonio River basin, the basin from which CPS Energy diverts water, and GBRA is not an ultimate consumer of water.  (D.E. 70 at 19-20.)  CPS Energy acknowledges, however, "GBRA and CPS Energy may have the same general purpose for seeking intervention."  (D.E. 70 at 20.)    Finally, CPS Energy notes that TCC "seeks to 'represent and protect the statewide chemical industry's common interest' and the 'broader public policy of how the State allocates water,' not the municipal electrical generation interests of CPS Energy.   Only CPS Energy represents the interests of its large electrical customer base."  (D.E. 70 at 20-21 (quoting D.E. 53 at 2,10).)

The Court disagrees with SAWS and CPS Energy's arguments.  While it may be true that Defendants, GBRA, or TCC alone could not adequately represent SAWS or CPS Energy's interests, the three together will represent both prospective intervenors' interests.  First, the TCEQ Defendants will play an important role in representing SAWS and CPS Energy's interests. SAWS admits that "Defendants do share some interests with SAWS in ensuring that water rights are not impeded," though it contends that their interests diverge.  (D.E. 59 at 14-15.)  Apart from general concerns about the TCEQ Defendants' focus in this lawsuit, CPS Energy does not specifically state what legal arguments or positions it would take, for example, that the Defendants would not.  In sum, the TCEQ Defendants will play an important role in representing

SAWS and CPS Energy's interests as a public agency responsible for ensuring the water needs of a large population.

Intervenor GBRA will also play an important role in representing SAWS and CPS Energy's interests. GBRA was established by the Texas Legislature, and has the responsibility to develop, conserve, and protect the water resources within a 10 county statutory district, beginning at the headwaters of the Guadalupe and Blanco Rivers, and ending at San Antonio Bay. It has broad authority to acquire surface water rights and sell water. GBRA is a water supplier to over 115 municipal, industrial, and agricultural users, including SAWS itself. (D.E. 27 at 8-9.) GBRA holds water rights to 175,501 acre-feet of water annually out of the Guadalupe River, and the right to divert 90,000 acre-feet of water annually stored at the Canyon Reservoir. (D.E. 27 at 9.) As a public entity with a large consumer base, including SAWS itself, GBRA can be trusted to adequately protect SAWS' interests. The mere fact that GBRA's interests lie in the Guadalupe River rather than the San Antonio River, or its interests concern surface water rather than ground water, as SAWS and CPS Energy argue (D.E. 59 at 16; D.E. 70 at 19-20), is not sufficient to conclude that GBRA will not substantially represent SAWS and CPS Energy's interests.

Lastly, Intervenor TCC, as an association of private users, will also adequately protect SAWS and CPS Energy's interests. As noted above, TCC is a statewide trade association of chemical manufacturing facilities in Texas, many of which could be negatively affected by this lawsuit. While it is true that "SAWS represents the interests of its extensive customer base . . . who depend on SAWS for their water supply," and TCC "represent[s] important but more narrowly focused and private commercial interests of . . . the chemical industry," (D.E. 59 at 15) both have the same interest in ensuring that water rights continue unimpeded by this lawsuit.

The same is true for CPS Energy, despite it being the only entity to represent "municipal electrical generation interests." (D.E. 70 at 20-21.) SAWS and CPS Energy fail to explain how the distinctions between their missions and that of TCC leads to the conclusion that TCC will not adequately represent their legal interests in this litigation.

While generally "[f]ederal courts should allow intervention where no one would be hurt and the greater justice could be attained," Heaton, 297 F.3d at 422, the Court in this case must conclude that allowing additional interventions would not lead to "greater justice," as it would open the door to any other entities who can identify some slight difference between their mission or purpose and that of existing parties to this litigation. Further interventions are unnecessary, as UCC's, TFB/AFBF's, SAWS's, and CPS Energy's interests are adequately represented through the existing parties. This conclusion is supported by the Certificates of Interested Parties filed in this case by the TCEQ Defendants and GBRA. Both list numerous public and private interests that are "financially interests in the outcome of this litigation," including farms, ranches, and other private users, municipal customers including SAWS itself, industrial customers such as UCC, and publicly traded companies such as Berkshire Hathaway, BP Chemical, and the Dow Chemical Company, as well as "water customers . . . that obtain water from the surface waters of the . . . San Antonio River Basin[]." (D.E. 14-2; D.E. 37 at 1-7.) These numerous public and private interests should be adequately protected by the existing parties, plus Intervenor TCC.

For the reasons stated above, the Court DENIES UCC's Motion to Intervene (D.E. 45), TFB/AFBF's Motion to Intervene (D.E. 51), SAWS's Motion to Intervene (D.E. 59), and CPS Energy's Motion to Intervene (D.E. 70) under Rule 24(a)(2). The Court briefly considers intervention under Rule 24(b)(1)(B).

### 3.   Permissive Intervention under Rule 24(b)(1)(B)

UCC, TFB/AFBF, SAWS, and CPS Energy seek intervention under Rule 24(b)(1)(B) as an alternative to Rule 24(a)(2).  (D.E. 45 at 14-15; D.E. 51 at 15; D.E. 59 at 16-17; D.E. 70 at 22-23.)  Plaintiff opposes permissive intervention.  (D.E. 58 at 19-20; D.E. 74 at 7-8.)

Federal Rule of Civil Procedure 24(b)(1)(B) provides, "[o]n timely motion, the court may permit anyone to intervene who: (B) has a claim or defense that shares with the main action a common question of law or fact."  Fed. R. Civ. P. 24(b)(1)(B).  Rule 24(b)(3) states, "[i]n exercising its discretion, the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights."  Fed. R. Civ. P. 24(b)(3).  Permissive intervention pursuant to Rule 24(b)(1) is appropriate when: "(1) timely application is made by the intervenor, (2) the intervenor's claim or defense and the main action have a question of law or fact in common, and (3) intervention will not unduly delay or prejudice the adjudication of the rights of the original parties."  League of United Latin Am. Citizens, Council No. 4434 v. Clements, et al., 884 F.2d 185, 189 n.2 (5th Cir. 1989); Sierra Club v. Fed. Emergency Mgmt. Agency, 2008 WL 2414333, at *6 (S.D. Tex. June 11, 2008) (citing Clements).  "When acting on a request for permissive intervention, a district court should consider, among other factors, whether the intervenors are adequately represented by other parties and whether they are likely to contribute significantly to the development of the underlying factual issues. When a proposed intervenor possesses the same ultimate objectives as an existing litigant, the intervenor's interests are presumed to be adequately represented absent a showing of adversity of interest, collusion, or nonfeasance."  Clements, 884 F.2d at 189 (internal citations omitted); Cal Data Systems, Inc. v. NCS Pearson, Inc., 2008 WL 1730539, at *2 (S.D. Tex. Apr. 10, 2008) (citing Clements).  "Permissive intervention is within a court's discretion."  Newby v. Enron Corp., 443 F.3d 416,

424 (5th Cir. 2006); <u>Kneeland v. Nat'l Collegiate Athletic Ass'n</u>, 806 F.2d 1285, 1289 (5th Cir. 1987) ("Permissive intervention is wholly discretionary with the [district] court . . . even though there is a common question of law or fact, or the requirements of Rule 24(b) are otherwise satisfied.").

The Court recognizes that its analysis of UCC's, TFB/AFBF's, SAWS's, and CPS Energy's right to intervene under Rule 24(a)(2) also weighs against a finding that they should be allowed to permissively intervene under Rule 24(b)(1)(B).  As an initial matter, the Court has already concluded that UCC and TFB/AFBF's interests will be adequately represented by Intervenor TCC, and that SAWS and CPS Energy will be adequately represented by Defendants, GBRA, and TCC.  (<u>See</u> supra Part III.B.2.d.)  As such, there is no need for intervention by other groups.  Further, the Court is concerned that allowing these interventions under Rule 24(b)(1)(B) will further complicate this case without any added benefit, in light of TCC's intervention and the interests of other entities already parties to this litigation.  <u>See</u> <u>Farouk Systems, Inc. v. Costco Wholesale Corp.</u>, 2010 WL 1576690, at *3 (S.D. Tex. Apr. 20, 2010) (rejecting permissive intervention because it "could add considerable complication and delay to this case").  Finally, as part of its role in managing this litigation, the Court must prevent an overflow of additional attempted interventions, which would be a likely consequence of allowing UCC, TFB/AFBF, SAWS, and CPS Energy to intervene under Rule 24(b)(1)(B).  <u>See, e.g.,</u> <u>Farouk Systems, Inc.,</u> 2010 WL 1576690, at *3 ("[T]he Court is concerned that, should AMLP be permitted to intervene, there may be no basis on which to prevent Farouk's 85 other distributors from also seeking to intervene."); <u>S.E.C. v. Bear, Stearns & Co., Inc.</u>, 2003 WL 22000340, at *4 (S.D.N.Y. Aug. 25, 2003) (rejecting permissive intervention by investors, and explaining "[w]ere this Court to grant this motion to intervene, it would be logic-bound to allow all investors and interested

members of the public with differing viewpoints to intervene in the underlying actions."). For these reasons, the Court must exercise its discretion to deny UCC's, TFB/AFBF's, SAWS's, and CPS Energy's Motions to Intervene (D.E. 45, 51, 59, 70) under Rule 24(b)(1)(B).

Lastly, while the Court has denied UCC's, TFB/AFBF's, SAWS's, and CPS Energy's Motions to Intervene, it recognizes that they have important interests in this litigation. To the extent positions they wish to present to the Court are not argued by the existing parties to this litigation, these entities may participate through amicus curiae submissions. Bush v. Viterna, 740 F.2d 350, 359 (5th Cir. 1984) ("Where he presents no new questions, a third party can contribute usually most effectively and always most expeditiously by a brief amicus curiae and not by intervention.") (internal quotation marks omitted); see South Carolina v. North Carolina, __ U.S. __, 130 S. Ct. 854, 875 (2010) (Roberts, C.J., concurring in part and dissenting in part) ("Courts often treat amicus participation as an alternative to intervention."). These entities thus have leave to participate as amicus curiae should they wish to do so.

## IV.    Conclusion

For the reasons stated above, the Court (1) GRANTS Texas Chemical Council's Motion to Intervene (D.E. 53); but (2) DENIES Union Carbide Corporation's Motion to Intervene (D.E. 45); (3) DENIES Texas Farm Bureau and American Farm Bureau Federation's Motion to Intervene (D.E. 51); (4) DENIES San Antonio Water System's Motion to Intervene (D.E. 59); and (5) DENIES CPS Energy's Motion to Intervene (D.E. 70).

SIGNED and ORDERED this 17th day of June, 2010.

Janis Graham Jack
United States District Judge