UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

THE ARANSAS PROJECT,                          §
                                              §
            Plaintiff,                        §
VS.                                           §        CIVIL ACTION NO. C-10-75
                                              §
BRYAN SHAW, *et al*,                          §
                                              §
            Defendants.                       §

## ORDER

Pending before the Court are Plaintiff The Aransas Project's Motion for Partial Summary

Judgment on Standing, (D.E. 213), State Official Defendants' Motion for Summary Judgment,

(D.E. 214), and Defendant-Intervenor Guadalupe-Blanco River Authority's Motion for Summary

Judgment, (D.E. 215).  For the reasons stated herein, the Court concludes that these motions

should be and are DENIED.

## I.     Jurisdiction

The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331

(federal question), 16 U.S.C. §§ 1540(c) & (g) (the Endangered Species Act),[1] and 28 U.S.C. §

2201 (the Declaratory Judgment Act).

## II.    Factual and Procedural Background

The Aransas Project (a non-profit corporation) ("Plaintiff" or "TAP") brought this action

on March 10, 2010 pursuant to the Endangered Species Act, 16 U.S.C. §§ 1540(c) & (g), against

several Texas Commission on Environmental Quality ("TCEQ") officials (Bryan Shaw, Buddy

Garcia, Carlos Rubinstein, and Mark Vickery) and the South Texas

---

[1] 16 U.S.C. § 1540(c) provides, "[t]he several district courts of the United States, including the courts enumerated in section 460 of title 28, shall have jurisdiction over any actions arising under this chapter," and Section 1540(g) provides for civil lawsuits under the Endangered Species Act.

Watermaster (Al Segovia) (collectively "Defendants").  In essence, Plaintiff alleges that Defendants' failure to adequately manage the flow of fresh water into the San Antonio Bay ecosystem during the 2008-2009 winter resulted in a "tak[ing]" of Whooping Cranes, an endangered species, in violation of Section 9 of the Endangered Species Act ("ESA"), 16 U.S.C. § 1538(a)(1)(B).  Plaintiff argues that the reduced flow of fresh water into the ecosystem increased salinity, reducing the food and water supply for the Whooping Cranes, thus weakening and ultimately resulting in the death of twenty-three Whooping Cranes.  (D.E. 1 at 2, 8-24.)[2]

Plaintiff requests declaratory and injunctive relief to ensure that the Whooping Cranes have sufficient water resources to prevent future "takings."  (D.E. 1 at 32-33.)  In essence, Plaintiff seeks a declaration that Defendants' actions resulted in a "taking" of Whooping Cranes in violation of Section 9 of the ESA, an injunction impacting current and future water diversions that result in takings of Whooping Cranes, and a court order requiring Defendants to develop a process to ensure that Whooping Cranes are protected.  (D.E. 1 at 32-33.)[3]

The TCEQ Defendants filed a Motion to Dismiss on May 14, 2010 (D.E. 40), and a Burford Abstention Motion on May 28, 2010.  (D.E. 57.)  Guadalupe-Blanco River Authority ("GBRA") (granted intervention on April 23, 2010 (D.E. 35)), filed a Motion to Dismiss on May

---

[2] GBRA disputes this characterization, and in fact argues that the Whooping Crane is recovering. (D.E. 229 at 4-5.) Nevertheless, the Whooping Crane is still listed as an endangered species, 50 C.F.R. § 17.11(h), and no more is required for Section 9 liability.

[3] More specifically, Plaintiff seeks inter alia: (1) a declaration that Defendants have violated Section 9 of the ESA and continue to do so; (2) a declaration that water-diversion regulations promulgated by Defendants are preempted by federal law when they purport to authorize water diversions that result in a taking of Whooping Cranes; (3) an injunction preventing Defendants from approving or allowing water diversions that destroy or alter the Whooping Crane habitat until the State provides reasonable assurances that such diversions will not take Whooping Cranes in violation of the ESA; (4) an injunction preventing Defendants from approving new water permits absent assurances that future water diversions will not take Whooping Cranes; (5) an order directing Defendants to develop a process for a complete accounting of all withdrawals from the Guadalupe and San Antonio River systems; (6) an order directing Defendants to conduct a thorough analysis of all permitted and exempted withdrawals and to create a water development and use plan sufficient to protect Whooping Cranes, "which may include reduction of existing water uses or addition of special conditions to existing permits"; and (7) an order directing plans to develop an approved Habitat Conservation Plan for the San Antonio and Guadalupe River basins and San Antonio Bay, "including provisions to reduce all withdrawals during low flow conditions to such an extent necessary to prevent" the taking of Whooping Cranes.  (D.E. 1 at 32-33.)

17, 2010. (D.E. 43.)   Plaintiff filed a Response to TCEQ Defendants' and GBRA's Motions on June 17, 2010. (D.E. 90.)   GBRA filed a Reply on June 23, 2010. (D.E. 115.)   The TCEQ Defendants filed a Reply on July 26, 2010. (D.E. 173.) [4]   On July 28, 2010 the Court heard oral arguments on these motions and denied all of them. (See D.E. 176.)

On September 15, 2011 Plaintiff filed its Motion for Partial Summary Judgment on Standing. (D.E. 213.)   Defendants TCEQ and GBRA also filed their respective Motions for Summary Judgment on September 15, 2011. (D.E. 214; D.E. 215.)   Together, Defendants' and GBRA's motions raise four broad arguments: (1) Plaintiff lacks standing and there is no case or controversy between the parties, (D.E. 215 at 11-16; D.E. 231), (2) Eleventh Amendment immunity bars Plaintiff's claim, (D.E. 214 at 23-25), (3) Plaintiff has failed to establish a right to recovery under the ESA, (D.E. 214 at 5-21; D.E. 215 at 8-15), and (4) the Complaint should be dismissed under the Burford abstention doctrine. (D.E. 215 at 24-29.)   The Court addresses each argument separately.

## III.   Discussion

### A.   Applicable Standard

---

[4] In addition to the Motions to Dismiss, the Court has received numerous amicus submissions by municipalities and other entities supporting dismissal of this suit.  The amicus parties include: City of Kerrville, CMC Steel Texas, Guadalupe Valley Electric Cooperative, Inc., Caldwell County, City of Boerne, City of Bulvede, City of Cibolo, City of Lockhart, City of Luling, City of San Marcos, City of Victoria, City of Yoakum, Fair Oaks Ranch, Foresight Golf Partners LTD, Golf Associates LTD, Guadalupe Basin Coalition, Guadalupe-Blanco River Authority Customers, Kendall County, Royal Marina Holdings, LLP, Royal Oaks Partners at Fulton Beach, LLP, SJWTX, Inc., Texas Water Conservation Association, Victoria County, National Water Resources Association, Comal County, Guadalupe County, City of Wimberley, City of New Braunfels, City Of Port Lavaca, Calhoun County, East Central Special Utility District, and the San Antonio Water System.  Generally, the amici supported the Motions to Dismiss.  Many amicus submissions are substantially similar, stating: "by focusing on only one fact in a complex, diverse water management system, the Plaintiff's Complaint ignores the many other stakeholders and multiple water management efforts addressing drought, water supply, water quality, and endangered species in the Guadalupe River Basin and the State.  If the Court were to grant the Plaintiff's requested relief, it would have far-reaching adverse and unintended consequences for all people and the environment in the Guadalupe River Basin."  (See, e.g., D.E. 92.)  The amici then go on to address consequences particular to their interests, such as hydroelectric generation, economic and social hardship, and availability of present and future water supplies.  Most supported dismissal on Burford abstention grounds, others also address lack of standing and failure to state a claim.

Plaintiff, TCEQ Defendants, and GBRA have all moved for summary judgment.  Under Federal Rule of Civil Procedure 56, summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The substantive law identifies which facts are material. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Ellison v. Software Spectrum, Inc., 85 F.3d 187, 189 (5th Cir. 1996).  A dispute about a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; Judwin Props., Inc., v. U.S. Fire Ins. Co., 973 F.2d 432, 435 (5th Cir. 1992).

On summary judgment, "[t]he moving party has the burden of proving there is no genuine issue of material fact and that it is entitled to a judgment as a matter of law." Rivera v. Houston Indep. Sch. Dist., 349 F.3d 244, 246 (5th Cir. 2003); see also Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  If the moving party meets this burden, "the non-moving party must show that summary judgment is inappropriate by setting forth specific facts showing the existence of a genuine issue concerning every essential component of its case." Rivera, 349 F.3d at 247.  The nonmovant's burden "is not satisfied with some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence." Willis v. Roche Biomedical Labs., Inc., 61 F.3d 313, 315 (5th Cir. 1995); see also Brown v. Houston, 337 F.3d 539, 541 (5th Cir. 2003) (stating that "improbable inferences and unsupported speculation are not sufficient to [avoid] summary judgment").  It is well established that "[t]he moving party need not produce evidence negating the existence of a material fact, but need only point out the absence of evidence supporting the nonmoving party's case." Saunders v. Michelin Tire Corp., 942 F.2d 299, 301 (5th Cir. 1992).

Summary judgment is not appropriate unless, viewing the evidence in the light most favorable to the non-moving party, no reasonable jury could return a verdict for that party. Rubinstein v. Adm'rs of the Tulane Educ. Fund, 218 F.3d 392, 399 (5th Cir. 2000). In considering a motion for summary judgment, the court cannot make credibility determinations, weigh the evidence, or draw inferences for the movant. Anderson, 477 U.S. at 255. The court must draw all justifiable inferences from the summary-judgment evidence in the light most favorable to the nonmovant. Id.

### B. Standing

#### 1. Elements

Under Article III of the U.S. Constitution, the federal judicial power is restricted to "Cases" and "Controversies." U.S. Const. Art. III, § 2. Under Article III, "the irreducible constitutional minimum of standing contains three elements." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992). These elements are "(1) an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent; (2) a causal connection between the injury and the conduct complained of; and (3) the likelihood that a favorable decision will redress the injury." Croft v. Governor of Texas, 562 F.3d 735, 745 (5th Cir. 2009) (citing Lujan, 504 U.S. at 560). As "the party invoking federal jurisdiction," the plaintiff "bears the burden of establishing these elements." Lujan, 504 U.S. at 561. The plaintiff must meet this burden "'with the manner and degree of evidence required at the successive stages of the litigation' . . . ." Id. In response to a motion for summary judgment on standing, a party may not rest on its allegations but must "'set forth' by affidavit or other evidence 'specific facts' . . . which for the purposes of the summary judgment motion will be taken as true." Id. (internal quotations and citations omitted).

### 2.      Application

In this case, GBRA and TCEQ Defendants dispute the three central elements of standing, namely (1) injury in fact, (2) redressability, and (3) causation.  (D.E. 215 at 11-16; D.E. 231.)  Defendants also argue that Plaintiff has not established associational standing requirements. (D.E. 229 at 30-31; D.E. 231.)

### a.      Injury in Fact

GBRA argues that TAP has not met its continuing obligation to demonstrate an actual or imminent injury, and that TAP cannot merely rely on speculation that its members may someday be injured in their ability to see Whooping Cranes.  (D.E. 215 at 12.)  Further, while Plaintiff broadly asserts damages to its members' economic and personal interests, Plaintiff provides no specific facts showing how a "purported take has prevented its members' pursuit or otherwise injured their economic or other interests."  (Id. at 13, n.5.)  Plaintiff does not allege, for example, that any of its members witnessed a taking of a Whooping Crane, or suffered a decline in business as a result of a take.  (Id.)

GBRA further contends that TAP's alleged injury is "belied by the fact that estimated crane counts . . . suggest that the whooping crane population is currently at an all-time record high."  (Id.)  Finally, GBRA contends that there is no evidence before the Court establishing a future take of cranes, and that the cases Plaintiff cites to show such future takes are inapposite from the case at bar.  (D.E. 229 at 14.)  GBRA therefore concludes that Plaintiff fails to meet its summary-judgment burden with respect to the injury-in-fact element of standing.  (Id. at 9.)

For its part, Plaintiff argues that the injury requirement may be satisfied by a demonstration of harm to its members' environmental, recreational, aesthetic or economic

interests.  (D.E. 213 at 11.)   Plaintiff then notes the deposition testimony of several of its members indicating that they have such interests in the Cranes.  (Id. at 12-13.)  These interests, TAP contends, give its members a 'personal stake' in the vitality and long-term survival of the Cranes.  (Id. at 13.)  Plaintiff argues that fewer birds will affect visual observation, recreational enjoyment and tourism, thus Plaintiff has met its summary-judgment burden with respect to its members' injury-in-fact.  (Id. at 14.)

In Lujan, the Supreme Court stated that "when the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily 'substantially more difficult' to establish."  504 U.S. at 562.   The Court recognized that "the desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purpose of standing.  But the 'injury in fact' test requires more than an injury to a cognizable interest.  It requires that the party seeking review be himself among the injured."  Id. at 562-63.  Later, in Friends of the Earth, Inc., the Court stated that "environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity."  Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), 528 U.S. 167, 183 (2000).

In the context of this case, Plaintiff's evidence sufficiently demonstrates injury in fact to its members.  TAP states that many of its members "are active birders and devote substantial time and effort to observing the Whooping Crane and other birds in their natural habitat," and that TAP members "reside and work in the Aransas area, and for some their livelihood depends in large part upon the Cranes."  (D.E. 1 at 28-29.)   Plaintiff further states, "[a]esthetic, recreational, economic, professional, and other interests of TAP and its members in observing,

photographing, studying, protecting and otherwise enjoying Whooping Cranes and other wildlife in their natural habitat are impaired by the destruction and alteration of Whooping Crane habitat, and the harm and harassment to Whooping Cranes resulting from Defendants' violations of the ESA." (D.E. 1 at 29.)   The Complaint goes on to list several examples of TAP members who have a direct financial interest in ensuring the Cranes' vitality, including the owners of the Crane House, which caters to visitors observing the Cranes, the captain of a bird watching tour boat, Aransas County itself, which benefits from tourism, and the Aransas Bird & Nature Club, whose members have a recreational interest in wildlife, including the Whooping Cranes. (D.E. 1 at 29-32.)  These allegations demonstrate that TAP's members "use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." Friends of the Earth, Inc., 528 U.S. at 183.

GBRA contends that, because Plaintiff's members have not yet experienced any impairment to their interests, Plaintiff cannot establish injury in fact. This contention is without merit. The Fifth Circuit has stated "that an injury is couched in terms of future impairment rather than past impairment is of no moment. The Supreme Court has expressly held that a 'threatened injury' will satisfy the injury in fact requirement for standing." Sierra Club, Lone Star Chapter v. Cedar Point Oil, 73 F.3d 546, 556 (5th Cir. 1996) (citing Valley Forge Christian College, 454 U.S. 464, 472 (1982)).  Here, Plaintiff's evidence indicates that if future water diversions are allowed, more Whooping Cranes may well be taken, threatening injury to the recreational, economic and aesthetic interests of TAP's members.

In addition, GBRA's suggestion that, in order to establish injury in fact, TAP members must have actually observed a crane mortality, is incorrect.  As the Supreme Court noted in Lujan, "[i]t is clear that the person who observes . . . a particular animal threatened by [the

challenged action] is facing a perceptible harm **because** the subject of his interest will no longer exist" 504 U.S. at 565 (emphasis added). In this context, then, perceptible harm hinges upon the potential nonexistence of an endangered species. It is not necessary that plaintiffs assert that they have witnessed the death of an endangered animal in order to establish perceptible harm to their interests. The Court concludes that the harms alleged by Plaintiff constitute injury in fact to its members that are both "concrete and particularized" and "actual or imminent," Croft, 562 F.3d at 745, rather than "conjectural or hypothetical." Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 103 (1998).

### b.      Redressability

With respect to the element of redressability, GBRA argues that Plaintiff fails to explain how altering the issuance of new or existing water permits will noticeably affect or remedy a specific injury that Plaintiff is allegedly suffering, and has failed to allege that Defendants could even take such action to alter permits or rights. (D.E. 215 at 15-16.) TCEQ officials have the authority to issue water permits but do not have the authority to alter those permits after they are issued. (Id.) GBRA argues that, because Texas law does not allow TCEQ officials to alter existing water permits, Plaintiff has not sufficiently demonstrated that a favorable decision could redress any injury TAP members purportedly suffer. (Id. at 16.)

Conversely, Plaintiff argues that redressability exists for both declaratory and injunctive relief. With respect to declaratory relief, Plaintiff argues that the requested relief would establish TCEQ Defendants' violation of the ESA, and would determine certain non-discretionary duties for the TCEQ Defendants not to harm the Cranes. (D.E. 213 at 21-22.) With respect to injunctive relief, Plaintiff points to the process for development of a Habitat Conservation Plan ("HCP") that, if sufficient, may lead to the issuance of an Incidental Take Permit ("ITP"). This

is one manner, according the Plaintiff, in which the TCEQ Defendants may protect the Cranes within the current regulatory framework.  (Id. at 18-21.)   Further, Plaintiff states that the list of equitable remedies in its Complaint is neither mandatory nor exhaustive, but rather a "range of options," all meant to ensure that the Defendants take the Cranes' need for fresh water into account.  (Id.)

The Court finds that the redressability element of standing is satisfied.  To establish redressability, it must be "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  Friends of the Earth, Inc., 528 U.S. at 181.  The Supreme Court has also explained that the relevant question is simply "whether a plaintiff personally would benefit in a tangible way from the court's intervention."  Citizens for a Better Env't, 523 U.S. at 103 n.5 (internal quotation marks omitted).  "When . . . a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of someone else . . . causation and redressability ordinarily hinge on the response of the regulated (or regulable) third party to the government action or inaction-and perhaps on the response of others as well."  Lujan, 504 U.S. at 562.

With respect to declaratory judgments, the Supreme Court has stated, "the question . . . is whether the facts alleged, under all the circumstances, show that there is a substantial controversy between parties having adverse legal interests, or sufficient immediacy and reality to warrant the issuance of a declaratory judgment."  MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 127 (2007).  Plaintiff seeks a declaration that Defendants have violated ESA Section 9 in the past and are presently violating Section 9 by issuing water permits and authorizing diversions, as well as a declaration that water diversion regulations are preempted by federal law when they purport to allow activities that result in the taking of Whooping Cranes.  (D.E. 1,

Prayer ¶ A, B, C.)  Even though the declaration would not, on its own, result in the issuance of new regulations or any particular change to Defendants' activities, it would likely aid in Plaintiff's overall goal of developing a process for the protection of the Whooping Cranes.  A finding that Defendants have violated the ESA will make it more likely that they will work to develop a process for protecting the Cranes.  At oral argument, Plaintiff confirmed that a declaratory judgment as to violation of ESA Section 9 would significantly redress its injury. (July 28, 2010, Hearing at 2:29:08 (Mr. Blackburn: "I think that a declaratory judgment from this Court that the Endangered Species Act had been violated would also be an incentive to find a solution.  We are willing to work with the State to come up and craft a solution.")).

As for Plaintiff's request for injunctive relief, (D.E. 1, Prayer ¶ D, E) the Court rejects Defendants' argument that they are essentially powerless to regulate water resources in the manner Plaintiff suggests.  The Court concludes that the TCEQ has authority over water permits and water diversions.  Even if it is true that the TCEQ Defendants can do little about existing permit holders,[5] they most certainly can implement changes with respect to new permits.  An injunction preventing new approvals of permits until there are "sufficient assurances" that these permits will not result in harm to the Whooping Cranes will clearly redress Plaintiff's concerns regarding adequate water supplies for the Cranes.

Finally, as to Plaintiff's other requested relief for the development of a process or plan to prevent future takes of Whooping Cranes, specifically the development of an HCP and the

---

[5] As discussed herein, Senate Bill 3 (2007) ("S.B. 3") provides the TCEQ with certain additional powers over water permits.  Although the Court concludes in its Burford analysis, below, that S.B. 3 does not adequately provide for protection of endangered species such as the Whooping Crane, it does grant the TCEQ certain additional powers that they may use to redress Plaintiff's injury.  For example, S.B. 3 provides "[a]ny permit for a new appropriation of water or an amendment to an existing water right that increases the amount of water authorized to be stored, taken, or diverted must include a provision **allowing the commission to adjust the conditions included in the permit or amended water right to provide for protection of instream flows or freshwater inflows**."  Tex. Water Code § 11.147(e-1) (emphasis added).  The TCEQ may also "suspend" permits in certain circumstances. Tex. Water Code § 11.148(a).

issuance of an Incidental Take Permit under 16 U.S.C. § 1539(a)(2), this too would redress Plaintiff's injury. The Supreme Court has rejected overly "draconian interpretation[s] of the redressability requirement." Larson v. Valente, 456 U.S. 228, 243 n.15 (1982). A plaintiff "satisfies the redressability requirement when he shows that a favorable decision will relieve a discrete injury to himself. He need not show that a favorable decision will relieve his *every* injury." Id. The mere fact that Plaintiff may not prevail on every request for relief by no means precludes a finding that its injury may be redressed in some manner by a favorable decision. Plaintiff has sufficiently demonstrated redressability.

### c.     Causation

Plaintiff argues that it has satisfied the element of causation, in that it has connected the Crane's "taking" to low flow conditions, and these low flow conditions to the TCEQ Defendants' water-management practices. (D.E. 213 at 16-17.) GBRA offers essentially two arguments in response. First, Plaintiff's theory of causation is based on a lengthy "chain of conjecture" that other courts have rejected. (D.E. 215 at 14.) Plaintiff fails to demonstrate that the acts of Defendants, rather than acts of third parties, are responsible for Plaintiff's injury. Second, GBRA asserts that TAP fails to offer evidence that links the low flow conditions with an increase in crane mortality.

With respect to GBRA's first argument, Plaintiff contends that, where a government regulator has been sued, courts have found a causal connection between the governmental activity at issue and the resulting take, even if third parties were the immediate cause of the taking. (D.E. 227 at 19.) In addition, Plaintiff argues that the causation standard for standing is different from the causation standard for purposes of liability, in that an indirect causal relationship will suffice, so long as there is a "fairly traceable connection between the alleged

injury in fact and the alleged conduct of the defendant."  (D.E. 213 at 15.)  Because the water permit holders only take water pursuant to the TCEQ Defendant's permission, Plaintiff argues, causation is established.  (See D.E. 227 at 10.)

The Court concludes that the first aspect of causation in this case, specifically, the relationship between Defendants' conduct and the low water flow conditions, is satisfied.  While a causal link may become "too attenuated" if an injury is "the result of the independent action of some third party not before the court," Lujan, 504 U.S. at 560, this is not the case here.  The TCEQ is directly responsible for issuing water permits, as its own website plainly states.  According to the website, "[t]he state may authorize the use of state water through a permitting system administered by the TCEQ . . . .  Each application for a permit is reviewed for administrative and technical requirements to evaluate its impact on other water rights, bays and estuaries, conservation, water availability, public welfare, etc."  See About Water Availability and Water Rights Permitting in Texas, http://www.tceq.state.tx.us/permitting/water_supply/water_rights/permits.html (last visited November, 4, 2011).  The website also includes a list of pending water-rights applications, totaling over 210 applications at the moment.  Pending Water Rights Apps., http://www.tceq.state.tx.us/permitting/water_supply/water_rights/pending.html (last visited November 4, 2011).  The Texas Administrative Code contains procedures governing the issuance of water permits by the TCEQ, and provides numerous prerequisites for the issuance of such permits.  30 Tex. Admin. Code § 297.41 et seq.

Essentially, Plaintiff alleges that the TCEQ Defendants did not properly consider the impact water permits would have upon the Whooping Crane population, particularly during drought periods, thus causing a "taking" of the Cranes in violation of ESA Section 9.  This

establishes causation.  The question of whether Defendants have any power to modify permits relates more to redressability than causation, and was addressed above.

Plaintiff's decision to sue the state regulators responsible for water usage rather than the water users themselves does not prevent a finding of causation.  As one court recently explained, "the plaintiff must show that it is substantially probable that the challenged acts of the defendant, not of some absent third party, will cause the particularized injury of the plaintiff. The more attenuated or indirect the chain of causation between the government's conduct and the plaintiff's injury, the less likely the plaintiff will be able to establish a causal link sufficient for standing."  Ctr. for Biological Diversity v. United States Dept. of Interior, 563 F.3d 466, 478 (D.C. Cir. 2009) (internal quotation marks and citations omitted).

As the Supreme Court has explained, it is incorrect to "equate[] injury 'fairly traceable' to the defendant with injury as to which the defendant's actions are the very last step in the chain of causation.  While, as we have said, it does not suffice if the injury complained of is the result of the independent action of some third party not before the court, that does not exclude injury produced by determinative or coercive effect upon the action of someone else."  Bennett v. Spear, 520 U.S. 154, 168-69 (1997) (internal citations and quotation marks omitted).  Consistent with this understanding, causation has been found to be too attenuated where governmental regulation is but one step in a very long chain of independent actions.  For example, in Center for Biological Diversity, the court explained:

> In order to reach the conclusion that Petitioners are injured because of [Department of the] Interior's alleged failure to consider the effects of climate change with respect to the Leasing Program, Petitioners must argue that: adoption of the Leasing Program will bring about drilling; drilling, in turn, will bring about more oil; this oil will be consumed; the consumption of this oil will result in additional carbon dioxide being dispersed into the air; this carbon dioxide will consequently cause climate change; this climate change will adversely affect the animals and their habitat; therefore Petitioners are injured by the adverse effects

on the animals they enjoy. Such a causal chain cannot adequately establish causation because Petitioners rely on the speculation that various different groups of actors not present in this case-namely, oil companies, individuals using oil in their cars, cars actually dispersing carbon dioxide-might act in a certain way in the future.

563 F.3d at 478-79. Similarly, in Florida Audubon Soc'y v. Bentsen, 94 F.3d 658, 669-70 (D.C. Cir. 1996), the court found causation between a tax credit and environmental damage too attenuated, stating:

> For the tax credit to pose a substantial probability of a demonstrably increased risk of particularized environmental damage, the credit must prompt third-party fuel producers to undertake the acquisition of production facilities for ETBE [a fuel additive] and begin to produce ETBE in such quantities as to increase the demand for ethanol from which the ETBE is derived. This increased demand for ethanol must then not simply displace existing markets for currently-produced ethanol, but in fact increase demand for the agricultural products from which ethanol is made. Again, this demand must not be filled by existing corn or sugar supplies, but instead spur new production of these products by farmers, who must be shown to have increased production at least to some measurable extent because of the tax credit, rather than any one of other innumerable farming considerations, including weather, the availability of credit, and existing subsidy programs. Moreover, any agricultural pollution from this increased production must be demonstrably more damaging than the pollution formerly caused by prior agricultural production or other prior use of land now cultivated because of the ETBE tax credit. Finally, the farmers who have increased production (and pollution) as a result of the tax credit must include farmers in the regions visited by appellants, and they must use techniques or chemicals in such fashion and to such extent as to threaten a demonstrably increased risk of environmental harm to the wildlife areas enjoyed by appellants.
>
> Such a protracted chain of causation fails both because of the uncertainty of several individual links and because of the number of speculative links that must hold for the chain to connect the challenged acts to the asserted particularized injury.

94 F.3d at 669-70.

In contrast, causation has been found where there has been a direct relationship between the challenged government regulation and the resulting "taking" of an endangered species, even where the actions of the regulated parties actually caused the taking. For example, in

Loggerhead Turtle v. County Council of Volusia County, Florida, plaintiffs sued Volusia County, alleging inter alia that its refusal to ban beachfront artificial light sources adversely impacted the loggerhead turtle, resulting in a taking in violation of ESA Section 9.  148 F.3d 1231, 1234-35 (11th Cir. 1998).  The Eleventh Circuit found that the plaintiffs had standing, and had sufficiently alleged causation based upon the lack of regulation, "even though the actions or inactions of those third parties not before the court may be another cause of the harm." 148 F.3d at 1253 (internal citations and quotation marks omitted).  Similarly, in Strahan v. Coxe, the district court found sufficient causation between harm to the endangered northern Right Whale and governmental regulation of commercial fishing vessels and whale-watching vessels in Massachusetts waters.  The court explained:

> Indisputably, the actions of third parties not before the court – commercial fishing and whale watch operations – are the immediate cause of the harm to endangered whales alleged here.  **Defendants do not place gillnets and lobster gear in coastal waters, nor do they operate whale watch vessels.  Nevertheless, the actions of these third parties are dependent on the actions of the Defendants**.  Fishing vessels cannot, legally, place gillnets and lobster gear in Massachusetts waters without permission from the Defendants.  And whale watch vessels cannot, legally, approach within 500 yards of Right whales in Massachusetts waters without permission from the Defendants.  Thus, to the extent that he challenges the operations of licensed commercial fishing and whale watch vessels, Strahan has shown a causal connection between the injury he has suffered (and will continue to suffer) and the actions of the Defendants in issuing such licenses.

Strahan v. Coxe, 939 F. Supp. 963, 978-79 (D. Mass. 1996);[6] see also Defenders of Wildlife v. Guiterrez, 532 F.3d 913, 924 (D.C. Cir. 2008) (in suit against United States Coast Guard alleging violations of ESA Section 9 due to establishment and maintenance of shipping lanes in areas inhabited by right whales, court rejected argument that chain of causation was too attenuated); Seattle Audubon Soc'y v. Sutherland, 2007 WL 1300964, at *5 (W.D. Wash. May 1, 2007)

---

[6] The district court opinion in Strahan was affirmed in part and vacated in part on different grounds by the First Circuit. 127 F.3d 155 (1st Cir. 1997).  The First Circuit did not alter the district court's standing analysis, and in fact upheld the district court's grant of injunctive relief under the ESA.  127 F.3d at 170.

(finding sufficient causation between state agency regulation over logging and taking of spotted owls, explaining, "[t]he alleged destruction of spotted owl habitat on private lands is fairly traceable to State Defendants' actions because State Defendants enforce the rules governing such logging operations and the independent logging operators cannot conduct Class III applications on their private lands without the authorization of the Department.").

In the instant case, Plaintiff's claims as to causation are much closer to those accepted in Loggerhead Turtle, Strahan, and Sutherland than those rejected in Center for Biological Diversity and Florida Audubon Society. Plaintiff has alleged that the TCEQ Defendants are responsible for water permitting and water diversions from the waterways at issue, and the increased diversions have left less water for the Cranes, resulting in a taking. This type of causation is sufficient for an ESA suit challenging governmental regulation. Indeed, under Defendants' and GBRA's theory of causation, an ESA lawsuit against a governmental regulation probably could never succeed, as government regulation on its own would almost never *directly* cause a taking (unless it involved government operations on government owned land). In most instances, governmental regulations can result in a taking only indirectly, through the actions of those subject to regulation, as Plaintiff alleges here. The Court concludes that Plaintiff's evidence demonstrates a causal link between Defendants' conduct and third-party water diversions.

With respect to the second aspect of causation in this case, namely, the connection between low flow conditions and crane mortality, the Court concludes that several issues of material fact remain. The Supreme Court has instructed that, at the summary judgment stage, a plaintiff's standing evidence is to be taken as true. Lujan, 504 U.S. at 561. Plaintiff, in its Complaint, provides a detailed explanation of the causal link between low flow conditions and

crane mortality. (D.E. 1 at 8-13). Specifically, Plaintiff argues that reduced water flows lead to high bay salinity, which in turn leads to a reduction in the availability of blue crabs, wolfberries and fresh drinking water. The reduced availability of the Cranes' primary food sources, coupled with the expenditure of energy made necessary by having to fly farther to freshwater sources, leads to malnourishment and ultimately the death of Whooping Cranes. Plaintiff provides evidence for each causal link which, if taken as true, could establish Plaintiff's claim.

Alternatively, GBRA argues that Plaintiff's evidence is problematic in several respects. Specifically, TAP has not demonstrated that 23 cranes actually died in the winter of 2008-2009. Even if it had, it is argued, the statistical evidence provided by Plaintiff's experts linking low freshwater inflows with crane mortality shows only a correlation between the two variables, not a causal link.

GBRA also contends that Plaintiff has not demonstrated that water diversions during the winter of 2008-2009 were markedly different from any other year, and that Plaintiff ignores other conditions more likely than salinity levels to affect the blue crab population. Moreover, GBRA argues that TAP's evidence does not indicate that a decrease in blue crabs and wolfberries creates food stress for whooping cranes, or that heightened salinity levels force them to expend significant energy locating fresh water to drink.

In the instant case, the evidence presented by Plaintiff, taken as true, establishes a causal link between Defendants' conduct and Plaintiff's injury, enabling Plaintiff to survive GBRA's and Defendants' motions for summary judgment. However, the assumption of truth mandated by the Court in Lujan does not go as far as Plaintiff might wish. Given that GBRA has presented competent counterevidence to several links in Plaintiff's alleged causal chain, a grant of partial summary judgment in favor of Plaintiff is, at this point, unwarranted.

### d.    Associational Standing

GBRA contends that, because TAP has not established that any of its members have standing, or that TAP has standing independently of its members, TAP lacks standing to bring suit on behalf of its members.  (D.E. 229 at 30-31.)  Plaintiff argues that it has standing because its individual members have standing. (D.E. 227 at 21.)

"An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." <u>Friends of the Earth, Inc.</u>, 528 U.S. at 181. As discussed above, Plaintiff has satisfied the standing elements of injury in fact and redressability.  If it subsequently establishes that injury to its members is fairly traceable to the actions of Defendants, Plaintiff will have established the standing of its members.  At such time, Plaintiff will also have met the associational standing requirements.  As discussed above, the interests in protecting the Whooping Cranes is clearly germane to TAP's purpose, and there is no indication that any claim or relief requires the participation of TAP's individual members.

While Plaintiff has established injury in fact and redressability, per analysis <u>supra</u>, the Court concludes that issues of material fact remain as to whether low flow conditions caused a take of Whooping Cranes.  Further, because TAP has not established that its members have standing, it cannot yet meet the requirements for associational standing.  Accordingly, Plaintiff's Motion for Partial Summary Judgment on Standing (D.E. 213) is DENIED.  Similarly, GBRA and Defendants have not met their burden in showing that there are no genuine issues of fact as to Plaintiff's standing.  Consequently, their requests for summary judgment as to this issue are DENIED.  (D.E. 215; D.E. 231.)

C.        Eleventh Amendment Immunity

The TCEQ Defendants argue that Eleventh Amendment immunity bars Plaintiff's claim. They argue that they lack the authority to cut off or proportionally reduce the entitlements of water-rights holders for reasons outside of the Texas Water Code's time priority system. Because permit holders as well as domestic and livestock users have rights, and Plaintiff seeks relief that would interfere with those rights, Defendants argue that Plaintiff in fact seeks retroactive relief, which is not allowed under the doctrine established in Ex parte Young, 209 U.S. 123 (1908). (D.E. 214 at 24.) Plaintiff responds that it seeks only prospective declaratory and injunctive relief, not damages, against state officers. (D.E. 227 at 51-52.) As such, the Eleventh Amendment does not bar the suit, under Ex parte Young, 209 U.S. 123 (1908). (Id. at 52.)

"In determining whether the doctrine of Ex parte Young avoids an Eleventh Amendment bar to suit, a court need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Maryland, 535 U.S. 635, 645 (2002) (citing Idaho v. Coeur d'Alene Tribe of Idaho, 521 U.S. 261, 296 (1997)); Ex parte Young, 209 U.S. 123 (1908). As the Fifth Circuit has explained, "[p]ursuant to the Ex parte Young exception, the Eleventh Amendment is not a bar to suits for prospective relief against a state employee acting in his official capacity. **Thus, prospective injunctive or declaratory relief against a state official is permitted but retrospective relief in the form of a money judgment in compensation for past wrongs is barred.**" Nelson v. Univ. of Texas at Dallas, 535 F.3d 318, 321-22 (5th Cir. 2008) (internal citations and quotation marks omitted; emphasis added); see also Davis v. Tarrant County, Texas, 565 F.3d 214, 228 (5th Cir. 2009) ("[T]he

Eleventh Amendment does not bar claims for prospective relief against state officials acting in their official capacity.") (citing Ex parte Young); Edelman v. Jordan, 415 U.S. 651, 664 (1974). The Complaint here does not seek any form of "money judgment in compensation of past wrongs," or other types of retrospective relief barred under the Eleventh Amendment. Nelson, 535 F.3d at 322.

The requirement that Plaintiff allege an ongoing violation of federal law is also clearly satisfied. See e.g., Coeur d' Alene, 521 U.S. at 294. Plaintiff has alleged that Defendants' continued water-permitting and diversion-authorization activities have and will continue to result in takings of Whooping Cranes (both in terms of deaths and harassment). (See, e.g., D.E. 1 at 24-25.) This is an ongoing violation of ESA Section 9 should it be proven.

Defendants' Eleventh Amendment immunity argument therefore fails. Consequently, Defendants' request for summary judgment on this ground is DENIED.

### D.   Violations of the ESA

#### 1.   Arguments

##### a.   TCEQ Defendants

The TCEQ Defendants contend that, as a matter of law, Plaintiffs are not entitled to recovery under ESA Section 9 because "[i]mputing liability to regulatory agencies for merely carrying out their regulatory duties runs contrary to [the] ESA . . . ." (D.E. 214 at 19.) Noting that Plaintiff relies largely upon the First Circuit's decision in Strahan v. Coxe, 127 F.3d 155 (1st Cir. 1997), Defendants argue that the holding in that case is incorrect, and attempt to demonstrate that the facts of the instant case are distinguishable. (Id. at 6.) As discussed further below, the First Circuit in Strahan held "that a governmental third party pursuant to whose authority an

actor directly exacts a taking of an endangered species may be deemed to have violated the provisions of the ESA."  127 F.3d at 163.

According to Defendants, the <u>Strahan</u> decision is flawed because the plain language and structure of the ESA demonstrate that it was not intended to be applicable to state regulators. (<u>Id.</u> at 19-21.)  Defendants also attempt to distinguish between the facts of this case and those of <u>Strahan</u>.  One key difference, Defendants argue, is that the TCEQ has almost no authority to modify or revoke water permits because such permits reflect property rights that are constitutionally protected under Texas law.  (<u>Id.</u> at 10.)  Further, TCEQ's regulatory powers are limited to those enumerated in the Texas Water Code and do not include many of the powers Plaintiff ascribes to it, such as the power to divert available water in order to reserve that water for the bay and estuary.  (<u>See id.</u> at 6.)  Finally, Defendants contend that this lack of authority demonstrates that they cannot have been the proximate cause of any purported take of Whooping Cranes.  (<u>Id.</u> at 21-23.)

### b.    GBRA

For its part, GBRA argues that Plaintiff's allegations, even if true, do not establish a take as a matter of law.  Despite broad allegations regarding deaths of Cranes, Plaintiff has not demonstrated "that a particular whooping crane has been harassed, harmed, pursued, hunted, shot, wounded, killed, trapped, captured or collected."  (D.E. 215 at 16.)  It also argues that the term "harassment" is irrelevant on the facts of the instant case because the term involves annoyance of wildlife, and no facts describing annoyance have been alleged.  (<u>Id.</u> at n.9.)

Moreover, even if Plaintiff did allege facts specifying the taking of a Whooping Crane, it has not alleged facts demonstrating that the taking was proximately caused by Defendants.  (<u>Id.</u> at 17-20.)  Finally, GBRA contends that the relief sought by Plaintiff is outside the scope of the

ESA's citizen-suit provision. (Id. at 20-23.)  TAP does not merely seek to enjoin Defendants'

conduct, it seeks to commandeer state water resources and change the water law of the state.

**c.** **Plaintiff's Response**

In response to the arguments of the TCEQ Defendants and GBRA, Plaintiff contends that

the TCEQ Defendants possess both express and implied authority by which they can act to avoid

a take.  (D.E. 227 at 21.)  In addition, though permit holders have rights in water, ultimately,

water is the property of the State.  (Id. at 25.)  Even assuming that TCEQ did not have any

authority under state law, Plaintiff argues, a state cannot legitimately authorize a state agency to

violate federal law in contradiction of the Supremacy Clause.  (Id. at 26.)

TAP further contends that the language of the ESA and relevant case law indicate that

regulators can be held liable for takings under the ESA.  (Id. at 28-31.)  Moreover, Plaintiff

argues that regulators can in fact be the proximate cause of a take under the ESA and that the

evidence it has provided demonstrates such causation.  Finally, Plaintiff contends that the relief it

seeks is within the scope of the ESA's citizen-suit provision.

**2.** **Analysis**

As detailed above, Defendants' and GBRA's arguments for summary judgment fall into

three broad categories: (1) ESA Section 9 does not allow actions against regulators for "takings,"

(2) the relief Plaintiff requests is outside the scope of the ESA's citizen-suit provision, and (3)

Plaintiff has not presented evidence of a take under the ESA that enables it to survive a motion

for summary judgment.  The Court addresses each argument separately.

**a.** **Applicability of ESA Section 9 to Regulators**

As an initial matter, the Court rejects Defendants' argument that ESA Section 9 does not

extend to suits brought against regulators whose actions indirectly result in a taking of an

endangered species.  Defendants' interpretation belies both the purposes of the ESA itself and consistent legal precedent.

The ESA itself is broadly worded and contains no explicit or implicit indication that it was not intended to apply to regulators.  The purpose of the ESA is to "provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, to provide a program for the conservation of such endangered species and threatened species, and to take such steps as may be appropriate to achieve the purposes of the treaties and conventions set forth in subsection (a) of this section."  16 U.S.C. § 1531(b).  In a manner consistent with this purpose, the Senate Report on the ESA states that the term "take" is defined "in the **broadest possible manner** to include every conceivable way in which a person can 'take' or attempt to 'take' any fish or wildlife."  Endangered Species Act of 1973, Senate Report No. 93-307 (emphasis added).

The Supreme Court has likewise recognized that Congress intended, with passage of the ESA, to "provide comprehensive protection for endangered and threatened species." Babbitt v. Sweet Home Chapter of Communities for a Great Oregon, 515 U.S. 687, 699 (1995).  The ESA even makes specific reference to water resource issues, stating that it is "the policy of Congress that Federal agencies shall cooperate with State and local agencies to **resolve water resource issues in concert with conservation of endangered species**."  16 U.S.C. § 1531(c)(2) (emphasis added).   In addition, the ESA also recognizes that "takings" may occur indirectly, as it prohibits any "person" from "caus[ing] to be committed" any offense under the ESA.  16 U.S.C. § 1538(g).  Importantly, the definition of "person" includes "any officer, employee, agent, department, or instrumentality . . . of any State, municipality, or political subdivision of a State."  16 U.S.C. § 1532(13).  These provisions indicate that the statute anticipates actions

against state officers for indirect takings.  The ESA's broad language demonstrates that courts should interpret the statute, including the "take" provision, in favor of according endangered species maximum protection, rather than to carve out exceptions that are not evident in the ESA's text.

This broad interpretation of the ESA has been adopted by courts around the nation.  All parties agree that there is no directly applicable case law in this Circuit.  Nevertheless, the weight of persuasive authority strongly supports the conclusion that ESA Section 9 extends to lawsuits against state or federal regulators for regulatory failures that result in a "taking," even if that taking is directly caused by the action of a regulated party.

As acknowledged above, the most directly relevant precedent is the First Circuit's decision in <u>Strahan v. Coxe</u>.[7]  <u>Strahan</u> involved a case brought against Massachusetts regulators alleging, <u>inter alia</u>, violations of ESA Section 9 based upon the issuance of licenses and permits allowing use of certain fishing gear, which harmed the northern Right Whales.  127 F.3d at 158. The First Circuit held that ESA Section 9:

> [N]ot only prohibits the acts of those parties that directly exact the taking, but also bans those acts of a third party that bring about the acts exacting a taking. We believe that, contrary to the defendants' argument on appeal, the district court properly found that **a governmental third party pursuant to whose authority an actor directly exacts a taking of an endangered species may be deemed to have violated the provisions of the ESA**.

127 F.3d at 163 (emphasis added).  The court further found that while the causation in that case was indirect, it was "not so removed that it extend[ed] outside the realm of causation as it is understood in the common law."  <u>Id.</u> at 164.  The <u>Strahan</u> court thus upheld a preliminary injunction against Massachusetts regulators.  As would be expected, district courts within the First Circuit have since applied <u>Strahan</u> in similar contexts.  <u>Animal Welfare Inst. v. Martin</u>, 588

---

[7] The Supreme Court denied certiorari in <u>Strahan</u>.  525 U.S. 830.

F. Supp. 2d 70, 99-100 (D. Me. 2008); <u>United States v. Town of Plymouth</u>, 6 F. Supp. 2d 81, 90 (D. Mass. 1998).

Although not directly on point, <u>Strahan</u> cites a Fifth Circuit case that also supports actions against regulatory agencies under the ESA. In <u>Sierra Club v. Yeutter</u>, 926 F.2d 429 (5th Cir. 1991), the plaintiff brought suit against the U.S. Forest Service challenging its lumber harvesting management practices, which the plaintiff claimed resulted in a taking of the red-cockaded woodpecker, an endangered species. 926 F.2d at 431. The Forest Service had developed a handbook that was meant to modify lumber harvesting practices to account for endangered species, but had not acted in accordance with the handbook. The Fifth Circuit concluded that the lower court did not err in finding that the U.S. Forest Service's management practices violated Section 9 of the ESA. <u>Id.</u> at 439 ("[I]t is not unreasonable to conclude that failure to observe the handbook would result in a 'taking' of the [woodpecker]. We therefore conclude that the district court did not err in finding that the government violated ESA Section 9.") While <u>Sierra</u> involved direct actions by the U.S. Forest Service, rather than indirect regulation such as that at issue in the case at bar and in <u>Strahan</u>, it demonstrates a willingness in this Circuit to find that governmental policy and action can lead to a violation of ESA Section 9.

At least two other circuits have issued rulings similar to <u>Strahan</u>. The Eighth Circuit in <u>Defenders of Wildlife v. EPA</u> found that the EPA could be held liable under ESA Section 9 for its registration (approval) of strychnine, a poison found in pesticides that harmed certain endangered species. 882 F.2d 1294, 1296-98 (8th Cir. 1989). In finding that the EPA's registrations of strychnine constituted takings of endangered species, the court explained

> The EPA's strychnine registrations had a prohibited impact on endangered species. . . . First, the record shows endangered species have eaten the strychnine bait, either directly or indirectly, and as a result, they have died. . . . Second, strychnine can be distributed only if it is registered. **Consequently, the EPA's**

**decision to register pesticides containing strychnine or to continue these registrations was critical to the resulting poisonings of endangered species**. The relationship between the registration decision and the deaths of endangered species is clear. We thus conclude the EPA's registrations constituted takings of endangered species.

Defenders of Wildlife, 882 F.2d at 1301 (emphasis added).

The Eleventh Circuit in Loggerhead Turtle v. County Council found that plaintiffs had standing to sue Volusia County, Florida for a taking under the ESA because its night-time beachfront lighting regulations harmed the loggerhead turtle, an endangered species.  148 F.3d 2131 (11th Cir. 1998).  The court stated:

 Volusia County is alleged to be a governmental third party pursuant to whose authority an actor directly exacts a taking of an endangered species.  Just as the Strahan agency was 'vested with broad authority to regulate fishing' under state law, Volusia County is 'vested with broad authority to regulate' artificial beachfront lighting under its charter and ordinances . . . .  Just as it was impossible in Strahan 'for a licensed commercial fishing operation to use its gillnets or lobster pots in a manner permitted by the [agency] without risk of violating the ESA[,]' a genuine issue of fact exists in this case that the lighting activities of landowners along Volusia County's beaches-as authorized through local ordinance-violate the ESA.

148 F.3d at 1253 (internal citations omitted).

As a final example, the district court in Sutherland concluded that state forestry officials could be held liable for a taking under the ESA due to regulations that harmed the spotted owl environment.  2007 WL 1300964, at *8.  The court stated, "[t]he plain language of the ESA supports the proposition that a government official violates the ESA take prohibition when that official authorizes someone to exact a taking of an endangered species, which, but for the authorization, could not have taken place."  Id.  The court continued, "[c]ourts have repeatedly held government officers liable for violating the take prohibition when the officers authorized activities undertaken by others that caused take."  Id. at *9 (citing Yeutter, 926 F.2d at 438-39).

Together, these cases support a broad interpretation of ESA Section 9, one that allows government regulators to be held responsible for takings that occur as a result of their regulations.  This is in harmony with the ESA's purpose, legislative history, and interpretation in the Supreme Court.   In a manner consistent with <u>Strahan</u> and other persuasive authority discussed above, the Court recognizes that "a governmental third party pursuant to whose authority an actor directly exacts a taking of an endangered species may be deemed to have violated the provisions of the ESA," specifically the "taking" provision in ESA Section 9. <u>Strahan</u>, 127 F.3d at 163.[8]

### b.        Scope of Relief under ESA's Citizen-Suit Provision

In this case, Plaintiff seeks (1) injunctive relief; (2) declaratory relief under the Declaratory Judgment Act, and (3) a court order requiring Defendants to take several affirmative steps to protect the Whooping Cranes and their habitat.  The parties do not dispute that the ESA's citizen-suit provision allows for injunctive relief.   <u>See</u> 16 U.S.C. 1540(g)(1)(A) ("Except as [otherwise provided] any person may commence a civil suit on his own behalf-**to enjoin any person**, including the United States or any other governmental instrumentality or agency (to the extent permitted by the eleventh amendment to the Constitution), who is alleged to be in violation of any provision of [the ESA] . . . .") (emphasis added).  GBRA contends, however, that what TAP seeks is not, in fact, injunctive relief and that injunctive relief is all that is permitted by the ESA's citizen-suit provision.  (<u>Id.</u> at 20.)

To the first argument, the Court merely notes that the Complaint specifically requests two forms of injunctive relief: (1) an injunction preventing Defendants from approving or allowing

---

[8] The Court disagrees with Defendants' attempt to distinguish <u>Strahan</u> on its facts, on the basis of their asserted limited regulatory authority.  The Court has already concluded that Defendants have sufficient authority, at least with respect to pending or future permits, to be held responsible for their failure to regulate, should that be demonstrated.  The Court does not read <u>Strahan</u> to apply only in situations where regulators have plenary authority.

water diversions that destroy or alter the Whooping Crane habitat until the State provides reasonable assurances that such diversions will not take Whooping Cranes in violation of the ESA; and (2) an injunction preventing Defendants from approving new water permits absent assurances that future water diversions will not take Whooping Cranes.  (D.E. 1 at 32-33.)  The citizen-suit provision of the ESA clearly provides for such relief.   See 16 U.S.C. § 1540(g)(1)(A).

Moreover, GBRA's argument that injunctive relief is all that is permitted by the ESA's citizen-suit provision is unpersuasive.  Subsection 1540(g)(5) states:

> The injunctive relief provided by [the citizen-suit provision] shall not restrict any right which any person (or class of persons) may have under any statute or common law to seek enforcement of any standard or limitation or to seek any other relief (including relief against the Secretary or a State agency).

16 U.S.C. § 1540(g)(5); see also Colorado River Cutthroat Trout v. Dirk Kempthorne, 448 F. Supp. 2d 170, 178 (D.D.C. 2006).  Thus, Plaintiff's right to seek declaratory relief under the Declaratory Judgment Act, 28 U.S.C. § 2201, a federal statute, is not foreclosed by the injunctive relief provided by the ESA's citizen-suit provision.

Finally, the Court rejects GBRA's implication that the injunctive relief afforded by the ESA limits this Court's ability to place affirmative obligations on Defendants to ensure their compliance with federal law.  The Supreme Court's holding in Weinberger v. Romero-Barcelo, et al., is instructive in this respect.  456 U.S. 305 (1982).  The issue under consideration in Weinberger was whether the language of the Federal Water Pollution Control Act ("Act") requires a district court to enjoin all discharges of pollutants that do not comply with the Act's permit requirements or whether "the district court retains discretion to order other relief to achieve compliance."  Id. at 306-07.

The respondents in <u>Weinberger</u>, the Governor of Puerto Rico and residents of the island, sought to enjoin the Navy's operations on the island, contending that such operations were violative of several environmental statutes. <u>Id.</u> at 307. At that time, the Navy conducted practice exercises on the island, which would often result in spent munitions falling into the sea. <u>Id.</u> The district court concluded that the Navy had violated the Act by "discharging ordnance into the waters surrounding the island without first obtaining a permit from the Environmental Protection Agency (EPA)." <u>Id.</u> at 307-08.

The district court ordered the Navy to apply for a permit, but refused to otherwise enjoin Navy operations pending the grant of the permit. <u>Id.</u> at 309. On appeal, the First Circuit vacated the district court's order and instructed the district court to order the Navy to cease the violation until a permit was obtained. <u>Id.</u> at 310. The appellate court reasoned that, in providing for injunctive relief, the Act withdrew the courts' equitable jurisdiction. <u>Id.</u> at 306-07. The Supreme Court reversed. <u>Id.</u> at 307.

The Court noted that statutes providing for particular grants of jurisdiction should be read against the backdrop of the courts' general ability to provide equitable relief. <u>Id.</u> at 313. Statues should be read in this manner because the exercise of equitable relief reflects a "practice with several hundred years of history," that is one of which Congress is well aware. <u>See id.</u> Further, while Congress may guide or control the exercise of the courts' discretion, the Court does not "lightly assume that Congress has intended to depart from established principles." <u>Id.</u> (citations omitted). The Court then cited to a prior holding explaining the nature of the courts' equitable jurisdiction:

> [T]he comprehensiveness of this equitable jurisdiction is not to be denied in the absence of a clear and valid legislative command. Unless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and

applied.  'The great principles of equity, securing complete justice, should not be yielded to light inferences of doubtful construction.'

Id. at 313 (internal citations omitted).

There is no "clear and valid legislative command" in the ESA's citizen-suit provision that would cause this Court to refrain from exercising its equitable jurisdiction.  To the contrary, the Court's authority to enforce the provisions of the ESA is broad.  Thus, if Defendants are found to have violated the provisions of the ESA, the Court can impose affirmative obligations upon Defendants to ensure their compliance with federal law.  See Strahan, 127 F.3d 155, 170 (affirming district court's order to state-official defendants to apply for an incidental take permit and noting that "[t]he ESA does not limit the injunctive power available in a citizen suit, and thus, we understand the Act to grant a district court the full scope of its traditional equitable injunctive powers.  'Equitable injunction includes the power to provide complete relief in light of the statutory purpose.'") (citations omitted).

### c.    Elements of ESA Section 9

Having established that ESA Section 9 allows for a cause of action against the TCEQ Defendants, and that the relief sought by Plaintiff is within the scope of the ESA, the Court now turns to GBRA's argument that it is entitled to summary judgment because Plaintiff fails to present evidence establishing a "taking" under Section 9.

In this case, the Court concludes that Plaintiff provides enough evidence of a "taking" of Whooping Cranes, both in terms of deaths and non-fatal harm, such as malnourishment, to survive a motion for summary judgment.[9]  Plaintiff presents evidence of the following facts: (1)

---

[9] At oral argument, GBRA contended that there is no evidence to establish "harassment" of the Cranes, which GBRA states refers only to "light, motion, or noise," and requests that reference to "harassment" in the Complaint be eliminated.  (July 28, 2010 Hearing at 2:25:26.)  The Court notes, however, that "harass" is defined in the Code of Federal Regulations as "an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are

23 Cranes died in Texas during the 2008-2009 winter, (2) the flock size declined from 270 to 247 Cranes by the end of the season, including the loss of sixteen juveniles, (3) one juvenile died during the 2009-2010 season in Texas, and (4) the Cranes experienced breeding difficulties. (D.E. 1 at 12-13.)  These estimates are based on scientific studies highlighted in the December 7, 2009 letter attached to the Complaint.  For example, the flock size decline is based upon the report of Tom Stehn, a U.S. Fish and Wildlife Service official.

Second, the Court concludes that there are genuine issues of fact as to Defendants' actions being the proximate cause of a "take" of Whooping Cranes.  (D.E. 1 at 20-23; D.E. 1-1 at 11-13; see supra Part III.B.2.c.)  The Court therefore finds that Plaintiff has presented enough factual material to survive summary judgment on the issue of Defendants' liability under the ESA.  For these reasons, both Defendants' and GBRA's motions for summary judgment are DENIED as to Plaintiff's claims under the ESA.

E.     **Burford** Abstention

GBRA argues that this Court should abstain from adjudicating this case on the basis of Burford abstention.  (D.E. 215 at 24-29.)  In Burford v. Sun Oil Co., the Supreme Court affirmed a district court decision dismissing an action in which the Sun Oil Company challenged a Texas Railroad Commission order granting Burford a permit to drill certain oil wells.  319 U.S. 315, 316-17 (1943).  "The order under consideration [was] part of the general regulatory system devised for the conservation of oil and gas in Texas, an aspect of as thorny a problem as has challenged the ingenuity and wisdom of legislatures."  Id. at 318.  Recognizing the significant state regulatory framework, the Court concluded that federal court abstention was proper.  The Court reasoned:

---

not limited to, breeding, feeding, or sheltering."   50 C.F.R. § 17.3.   The allegations sufficiently demonstrate "harassment," within this definition.

The state provides a unified method for the formation of policy and determination of cases by the Commission and by the state courts.  The judicial review of the Commission's decisions in the state courts is expeditious and adequate.  Conflicts in the interpretation of state law, dangerous to the success of state policies, are almost certain to result from the intervention of the lower federal courts.  On the other hand, if the state procedure is followed from the Commission to the State Supreme Court, ultimate review of the federal questions is fully preserved here.  Under such circumstances, a sound respect for the independence of state action requires the federal equity court to stay its hand.

Burford, 319 U.S. at 333-34.  The Fifth Circuit has recently explained, "Burford abstention applies when a case involves a complex issue of unsettled state law that is better resolved through a state's regulatory scheme."  Moore v. State Farm Fire & Cas. Co., 556 F.3d 264, 272 (5th Cir. 2009) (citing Burford, 319 U.S. at 332).  As part of its Burford abstention analysis, a court should consider five factors:

(1) whether the cause of action arises under federal or state law; (2) whether the case requires inquiry into unsettled issues of state law or into local facts; (3) the importance of the state interest involved; (4) the state's need for a coherent policy in that area; and (5) the presence of a special state forum for judicial review.

Moore, 556 F.3d at 272 (citing Wilson v. Valley Elec. Membership Corp., 8 F.3d 311, 314 (5th Cir. 1993)).

### 1.    Arguments

#### a.    GBRA

Intervenor GBRA argues that Burford abstention is applicable here, where Plaintiff's requested relief "would affect *all* new and existing water rights within the San Antonio and Guadalupe River Basins and would require the State entities to engage in far reaching and burdensome undertakings . . . ."  (D.E. 215 at 24.)  In arguing for abstention, GBRA relies heavily upon the Fifth Circuit's decision in Sierra Club v. City of San Antonio, 112 F.3d 789 (5th Cir. 1997).  Sierra Club was an ESA case involving water withdrawals from the Edwards Aquifer that resulted in a taking of certain endangered species, in which the Fifth Circuit held

that the lower court erred by issuing an injunction because the case was not likely to succeed on the merits due to Burford.  Id.  In holding as it did, the court noted the need for "uniform regulation" in the regime governing water withdrawals.  Id. 795.

GBRA notes that the considerations underlying Sierra Club are present in the instant case given that water is a vital interest, and comprehensive state water regulation has only expanded since Sierra Club was decided.  (See id. at 25.)  In GBRA's estimation, Burford abstention is especially warranted in this case given that: "(1) the comprehensive water management actions that TAP seeks to require throughout the Guadalupe and San Antonio River Basins are far greater in scope and potential disruption than the relief sought in [Sierra Club], and (2) the specific actions in [Sierra Club] had already been determined to cause takes of listed species, whereas here there is no proof that the 'take' occurred at all . . . ."  (Id.)

b.      Plaintiff

Plaintiff argues that Burford abstention is a very narrow exception to a federal court's duty to adjudicate cases before it.  Plaintiff notes several subsequent Supreme Court cases in which Burford abstention was rejected, including New Orleans Pub. Serv., Inc. v. Council of City of New Orleans, 491 U.S. 350 (1989) ("NOPSI") and Quackenbush v. Allstate Ins. Co., 517 U.S. 706 (1996).  These cases indicate that Burford abstention is rare and does not require a federal court to abstain whenever there is a state process or a potential for conflict with state regulatory law or policy.  Moreover, Burford abstention is inappropriate when a state regulatory system does not provide an adequate forum for adjudicating a plaintiff's claim.  (D.E. 90 at 39-40.)[10]

---

[10] Plaintiff's Consolidated Response specifically incorporates the Burford abstention arguments contained in its Response in Opposition to Motion to Abstain (D.E. 90) and in its Response in Opposition to Motion to Dismiss (D.E. 167). (D.E. 227 at 42 n.17.)

Plaintiff also argues that <u>Sierra Club</u> is factually distinguishable, and contends that it is an "outlier among <u>Burford</u> cases." (D.E. 90 at 41.) Plaintiff contends that <u>Sierra Club</u> in fact supports denial of abstention in this case. Specifically, the <u>Sierra Club</u> decision rested in large part on the 1993 Edwards Aquifer Act, which was specifically designed to address the preservation of endangered species. In contrast, no such legislation exists here, and the S.B. 3 process, even if it ensures water for the Cranes, is not nearly complete.

In addition, Plaintiff argues that S.B. 3 has numerous deficiencies, in that it would not regulate permitted users with permit dates before September 1, 2007, would not regulate exempted users, would not allow challenges to permits already issued, and gives no particular consideration to endangered species. (D.E. 90 at 43-44.) Plaintiff also contends that no timely and adequate state court review is available here, particularly with respect to Plaintiff's ESA claims. (D.E. 90 at 44-45.) Plaintiff argues that the S.B. 3 process "does not secure a mandate or establish a process to protect Whooping Cranes as required by the Endangered Species Act." (D.E. 90 at 46.) Plaintiff contends that there is simply no reason to abstain in deference to the existing regulatory system, which has already resulted in takes. (D.E. 90 at 46-47.) Moreover, none of S.B. 3's provisions can guarantee sufficient freshwater flows for the Cranes, and there is no definitive timeline for completion of the S.B. 3 process. (D.E. 90 at 48-50.)

Plaintiff also asserts that none of the other state processes that GBRA has identified, such as the South Texas Water Planning Group, the TCEQ water rights permitting process, and the Edwards Aquifer Recovery Implementation Plan, warrant abstention, as these also do not adequately address Plaintiff's concerns. (D.E. 90 at 51-53.) Finally, Plaintiff contends that application of the five <u>Wilson</u> factors also do not warrant abstention in this case. (D.E. 90 at 54-55.)

2.      **Analysis**

The Supreme Court has stressed "the narrow range of circumstances in which <u>Burford</u> can justify the dismissal of a federal action."  <u>Quackenbush</u>, 517 U.S. at 726.  The Court begins by reviewing two of the most recent Supreme Court opinions on <u>Burford</u> abstention, <u>NOPSI</u> and <u>Quackenbush</u>.  In <u>NOPSI</u>, the Supreme Court distilled its previous <u>Burford</u> rulings into the following general principle:

> Where timely and adequate state-court review is available, a federal court sitting in equity must decline to interfere with the proceedings or orders of state administrative agencies: (1) when there are difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar; or (2) where the exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.

491 U.S. at 361.  The Supreme Court ultimately rejected application of <u>Burford</u> abstention in <u>NOPSI</u>, stating:

> While <u>Burford</u> is concerned with protecting complex state administrative processes from undue federal interference, it does not require abstention whenever there exists such a process, or even in all cases where there is a "potential for conflict" with state regulatory law or policy.  Here, NOPSI's primary claim is that the [New Orleans City] Council is prohibited by federal law from refusing to provide reimbursement for FERC-allocated wholesale costs.  Unlike a claim that a state agency has misapplied its lawful authority or has failed to take into consideration or properly weigh relevant state-law factors, federal adjudication of this sort of pre-emption claim would not disrupt the State's attempt to ensure uniformity in the treatment of an "essentially local problem."
>
> But since, as the facts of this case amply demonstrate, wholesale electricity is not bought and sold within a predominantly local market, it does not demand significant familiarity with, and will not disrupt state resolution of, distinctively local regulatory facts or policies.

491 U.S. at 363-64.

In <u>Quackenbush</u>, the Supreme Court further summarized its <u>Burford</u> jurisprudence as follows:

[T]he power to dismiss under the Burford doctrine . . . derives from the discretion historically enjoyed by courts of equity. . . .  [E]xercise of this discretion must reflect "principles of federalism and comity."   Ultimately, what is at stake is a federal court's decision, based on a careful consideration of the federal interests in retaining jurisdiction over the dispute and the competing concern for the "independence of state action," that the State's interests are paramount and that a dispute would best be adjudicated in a state forum.  **This equitable decision balances the strong federal interest in having certain classes of cases, and certain federal rights, adjudicated in federal court, against the State's interests in maintaining "uniformity in the treatment of an 'essentially local problem,' " and retaining local control over "difficult questions of state law bearing on policy problems of substantial public import." This balance only rarely favors abstention**, and the power to dismiss recognized in Burford represents an " 'extraordinary and narrow exception to the duty of the District Court to adjudicate a controversy properly before it.' "

Quackenbush, 517 U.S. at 727-28 (emphasis added; internal citations omitted).  In Quackenbush, the Court ultimately rejected application of Burford because monetary damages were sought, not equitable or other discretionary relief.  Id. at 731 (confirming that Burford is applicable "to all cases in which a federal court is asked to provide some form of discretionary relief.").  Thus, NOPSI and Quackenbush demonstrate that Burford abstention is a very narrow, limited exception, particularly in light of this Court's duty to adjudicate all cases over which it has jurisdiction, including cases brought under ESA Section 9.

With these general principles in mind, the Court now turns to Sierra Club v. City of San Antonio and its application of Burford.  In Sierra Club, Plaintiff brought suit under the ESA, alleging that the City of San Antonio's water withdrawals from the Edwards Aquifer resulted in a "taking" of certain endangered species that lived in the Comal and San Marcos Springs.  See 112 F.3d at 792.  Plaintiff sought to enjoin defendants "to reduce withdrawals from the Edwards by such levels as are necessary to maintain minimum natural springflows from the Comal and San Marcos Springs for the conservation and survival of the endangered and threatened species living at and downstream from those springs."  Id. at 791-92.  In place at the time of the suit was

the Edwards Aquifer Act, which is a "comprehensive regulatory scheme" for the Aquifer. See id. The district court granted the injunction, and defendants appealed. Id. at 791.

On appeal, the Fifth Circuit did not consider "the ultimate question of whether the district court should abstain," but rather "whether the court properly entered a preliminary injunction," which "turns on whether the Sierra Club established a substantial likelihood of success on the merits in the face of the Burford abstention doctrine." Id. at 793. The Court found that Burford abstention was applicable. See id. at 794-98. It first reviewed the structure and function of the Edwards Aquifer Act:

> [T]he Edwards Aquifer Act can fairly be characterized as a comprehensive regulatory scheme. It represents a sweeping effort by the Texas Legislature to regulate the aquifer, with due regard for all competing demands for the aquifer's water. The Act vests the Edwards Aquifer Authority with "all the powers and privileges necessary to manage, conserve, preserve, and protect the aquifer . . . ." The Authority controls withdrawals from the aquifer through a permit system. . . . **The Act also specifically addresses the preservation of endangered species. Under § 1.14 of the Act the Authority must "protect aquatic and wildlife habitat" and "protect species that are designated as threatened or endangered under applicable federal or state law."** The Authority is empowered to file civil suits in state district court for an injunction. In addition, a separate entity, the Texas Natural Resource Conservation Commission, is authorized under § 1.39 of the Act to file suit for an order of mandamus against the Authority to compel the Authority to perform its duties.

112 F.3d at 794 (emphasis added). The court recognized that, "[t]he regulation of water resources is likewise a matter of great state concern. . . . [C]onservation of water has always been a paramount concern in Texas, especially in times, like today, of devastating drought.'" Id. (internal citations omitted). Further, the court observed that "both the aquifer and the endangered species are entirely intrastate, which makes management of the aquifer a matter of peculiar importance to the state." Id. The court also noted, "[a]s in Burford, there is a need for unified management and decision-making regarding the aquifer, since allowing one party to take water necessarily affects other parties." Id. at 795.

In this case, the issue is not whether this Court should follow <u>Sierra Club</u>, but rather whether the factual circumstances present in that case are present here, and thus warrant application of <u>Burford</u> abstention.  "As has been stated time and time again, <u>Burford</u> abstention requires a very careful and fact-specific inquiry."  <u>Property & Cas. Ins. Ltd. v. Cent. Nat. Ins. Co. of Omaha</u>, 936 F.2d 319, 326 n.13 (7th Cir. 1991); <u>Navajo Life Ins. Co. by Gallinger v. Fidelity and Deposit Co. of Maryland</u>, 807 F. Supp. 1485, 1489 (D. Az. 1992) (requiring a "fact-specific inquiry" in applying <u>Burford</u> abstention).  The Court must therefore look beyond the superficial similarities between <u>Sierra Club</u> and the case at bar (i.e., endangered species and water conservation), and closely examine whether in fact <u>Burford</u> abstention is appropriate here.  Upon a review of S.B. 3 and other factual considerations, it is apparent that the circumstances that led to the <u>Sierra Club</u> court's application of <u>Burford</u> abstention are nonexistent in this case.

First, the <u>Sierra Club</u> court expressly recognized that the Edwards Aquifer Act "specifically addresses the preservation of endangered species. Under § 1.14 of the Act the Authority must 'protect aquatic and wildlife habitat' and 'protect species that are designated as threatened or endangered under applicable federal or state law.'"  112 F.3d at 794.  Such specific reference to endangered species is absent in S.B.3, as Defendants acknowledge.  (D.E. 173 at 2; July 28, 2010 Hearing at 1:46:54 (Judge: "Does [S.B. 3] say specifically anywhere in there 'endangered species?'" Mr. Berwick: "No.").  While S.B. 3 does make reference to supporting a "sound ecological environment," the statute outlines many other factors to be considered "[i]n adopting environmental flow standards for a river basin and the bay system," including "economic factors," "the human and other competing water needs in the river basin and bay system," and "any other appropriate information," a catch-all provision.  Tex. Water Code § 11.1471(b)(7), (8), (10).  With these various competing interests, there is no assurance that the

interests of endangered species will be considered, let alone prevail.  As the numerous <u>amicus</u> submissions in this case demonstrate, the interests of municipalities, counties, and private entities concerned about having sufficient water to maintain growth may outweigh any objection from those seeking to protect endangered species.  See <u>Sutherland</u>, 2007 WL 1300964, at *15 (distinguishing <u>Sierra Club</u> based upon the Edwards Aquifer Act's specific reference to the ESA).

Second, while the Edwards Aquifer Act was characterized by the <u>Sierra Club</u> court as a "sweeping effort by the Texas Legislature to regulate the aquifer, with due regard for all competing demands for the aquifer's water," which "vests the Edwards Aquifer Authority with 'all the powers and privileges necessary to manage, conserve, preserve, and protect the aquifer . . . .'" 112 F.3d at 794, S.B. 3 has no such broad reach.   The parties do not dispute that S.B. 3 would have no effect whatsoever on permits issued before September 1, 2007.  (See D.E. 57 at 12) ("A permit issued before September 1, 2007 will not be affected by the to-be-adopted flow standards and set-asides [under S.B. 3].  If, however, the holder of such a permit applies to amend it to increase the authorized amount, the set-asides and standards will come into play with respect to the proposed increase."); Tex. Water Code § 11.147(e-1) ("This subsection does not affect an appropriation of or an authorization to store, take, or divert water under a permit or amendment to a water right issued before September 1, 2007.").  S.B. 3 also contains no authority to regulate exempted water users, such as domestic and livestock users.  S.B. 3 simply does not address Plaintiff's concerns.  Plaintiff alleges that water usage by permitted and exempted users before and during the 2008-2009 drought caused a "taking" of the Whooping Cranes.  Even if the S.B. 3 process went into effect, and curtailed or prevented the issuance of

any new permit from this point forward, this would not impact existing water usage, the very usage that Plaintiff alleges caused a taking in the first place.

Third, Defendants acknowledge that TCEQ is not scheduled to issue a rule establishing flow standards and set asides for the Guadalupe and San Antonio River basins pursuant to S.B. 3 until September 1, 2012, almost a year from now, and even admit that the September 2012 date is not entirely certain.  (D.E. 57 at 11; July 28, 2010 Hearing at 1:42:52 (Mr. Berwick: "The rules setting environmental flow standards must be made by September 1, 2012 under the current schedule. Now Mr. Blackburn is going to jump up and say 'but they can bend the schedule.' Yes, I suppose they could.").  While the Fifth Circuit in Sierra Club stated, "[w]e do not believe that Burford abstention is applicable only where the state regulatory scheme is fully in place," 112 F.3d at 796, the absence of a regulatory scheme with respect to the Guadalupe and San Antonio Rivers could cause (if Plaintiff's version of causation is accepted), additional takings of Whooping Cranes.  Simply put, the S.B. 3 process is set to go into effect some time from now, and the mere specter of a future decision does not require abstention here.

Finally, the Sierra Club court placed particular emphasis on the fact that "the aquifer and the endangered species are entirely intrastate, which makes management of the aquifer a matter of peculiar importance to the state."  Id. at 794.  Such is not the case here.  Plaintiffs have demonstrated that the Whooping Cranes are migrating birds that return to Canada in the spring, making stops along the way.  The interstate, and indeed international nature of the Cranes, further suggests that Burford abstention is not appropriate here.  See Sutherland, 2007 WL 1300964, at *15 (distinguishing Sierra Club on the grounds that the endangered spotted owl inhabited an interstate range).  These considerations demonstrate that, while Burford abstention may have been appropriate in Sierra Club, it is not appropriate here.

A review of the five Burford factors articulated in Wilson, 8 F.3d at 314, also counsels against abstention.  First, this cause of action arises under the ESA, not state law.  While the Fifth Circuit has explained that "Burford abstention does not so much turn on whether the plaintiff's cause of action is alleged under federal or state law, as it does on whether the plaintiff's claim may be 'in any way entangled in a skein of state law that must be untangled before the federal case can proceed,'" 112 F.3d at 795, "the presence of a federal basis for jurisdiction may raise the level of justification needed for abstention."  Colorado River Water Conservation Dist. v. United States, 424 U.S. 800, 815 n.21 (1976).  In any event, Plaintiff's ESA claim cannot be said to be "entangled in a skein of state law that must be untangled," any more than any other ESA case that challenges state regulation, such as Strahan or Loggerhead Turtle.

Second, it does not appear that the case would require "inquiry into unsettled issues of state law or into local facts."  Wilson, 8 F.3d at 314.  While complex issues of state law may be involved, Texas water law is not "unsettled" in such a way that would require interpretation from the state courts, nor are any "local facts" particularly determinative.

Third, while water is undoubtedly an important state interest, the protection of endangered species is an important national and even international interest, as recognized by the ESA itself.  See 15 U.S.C. § 1531(a)(3) ("[Endangered species] are of esthetic, ecological, educational, historical, recreational, and scientific value to the Nation and its people."); 15 U.S.C. § 1531(a)(4)(A) ("The Congress finds and declares that . . . the United States has pledged itself as a sovereign state in the international community to conserve to the extent practicable the various species of fish or wildlife and plants facing     extinction, pursuant to . . . migratory bird treaties with Canada and Mexico.").  The ESA in fact seeks to harmonize these competing

concerns, stating that it is "declared to be the policy of Congress that Federal agencies shall cooperate with State and local agencies to resolve water resource issues in concert with conservation of endangered species."  15 U.S.C. § 1531(c)(2).[11]  The Court cannot say that the state interest in controlling its water resources outweighs the national interest in protecting endangered species.

Fourth, the state's need for a coherent water resources policy, while important, must be subject to applicable federal law, including the ESA.  This lawsuit would not somehow make state water law "incoherent," but rather would ensure that TCEQ officials abide by the ESA when exercising their authority over state water resources.

Finally, although there is a "special state forum for judicial review," as provided by the Texas Administrative Procedures Act, Tex. Gov't Code ch. 2001, because S.B. 3 has no effect upon water permits issued before September 1, 2007, any state court review would be only as to determinations made under S.B. 3 with respect to new and recent permits.  Moreover, any such review would not focus specifically on protection of endangered species, but rather upon all the various considerations involved with water permitting.  There is no guarantee that Plaintiff's interests in protecting the Cranes would be adequately protected in state proceedings.

In sum, the Court declines to apply the limited <u>Burford</u> abstention principle in this case. Unlike the state law at issue in <u>Sierra Club</u>, neither S.B. 3, nor any other state process provides an adequate basis for abstention.[12]  The Court will not abstain from its duty to adjudicate this

---

[11] The Fifth Circuit in <u>Sierra Club</u> recognized this section of the ESA but stated that "[t]he language of the federal Act does not suggest that abstention is to be avoided in cases brought under it."  112 F.3d at 798.

[12] GBRA briefly makes reference to three other state programs in support of their abstention argument: (1) the South Texas Regional Water Planning Group (S.B. 1 process); (2) the TCEQ water rights permitting process; and (3) the Edwards Aquifer Recovery Implementation Program ("EARIP").  (D.E. 215 at 17 n.24) (specifically incorporating D.E. 43 at 10-11; 13-14.)  Plaintiff contends that each is inadequate.

First, the S.B. 1 process sets up different regions for water conservation purposes.  The Guadalupe and San Antonio Rivers are within Region L.  Region L has no authority over existing water diversions.  The regional water plan does

case.[13]   Accordingly, GBRA's motion for summary judgment on <u>Burford</u> abstention grounds is

DENIED.

---

list endangered species found in the region, including the Whooping Crane, but does not specifically address protection of those species.  Further, the S.B. 1 process has been in effect since 1997, and apparently has not had the necessary effect, if Plaintiff's allegations are true.  <u>See</u> http://www.regionltexas.org/.

Second, to the extent that GBRA relies upon the existing permitting process, this is the very process at issue in this case.  It would make little sense to defer to the very process that Plaintiff contends is inadequate.

Finally, the EARIP process relates to conservation efforts in the Edwards Aquifer.  It does not specifically relate to the Whooping Cranes, and has no authority to regulate surface water use, which is directly at issue in this case.  <u>See</u> EARIP Final Rules § 705.3, available at http://www.edwardsaquifer.org/files/ Final_Rules_May_2011.pdf ("The power of the Authority does not extend to the regulation of the diversion and beneficial use of surface water. As may be authorized by law, the Authority may regulate activities affecting the quality of surface water in order to preserve and protect the Aquifer, prevent the waste or pollution of the Aquifer, and enforce water quality standards.").

[13] The conclusion that the ESA should not yield to state water rights is consistent with case law and commentary in this area.  In <u>United States v. Glenn-Colusa Irrigation Dist.</u>, the district court rejected the defendant's argument that "state water law rights should prevail over the Endangered Species Act."  788 F. Supp. 1126, 1134 (E.D. Cal. 1992).  The Court explained, "[t]he [ESA] provides that federal agencies should cooperate with state and local authorities to resolve water resource issues regarding the conservation of endangered species. 16 U.S.C. § 1531(c)(2). This provision does not require, however, that state water rights should prevail over the restrictions set forth in the Act. Such an interpretation would render the Act a nullity. The Act provides no exemption from compliance to persons possessing state water rights, and thus the District's state water rights do not provide it with a special privilege to ignore the Endangered Species Act." <u>Id.</u>

Many commentators have also concluded that state water rights should not prevail over ESA considerations.  <u>See, e.g.</u>, Glen Spain, <u>Dams, Water Reforms, and Endangered Species in the Klamath Basin</u>, 22 J. Envtl. L. & Litig. 49, 68 (2007) ("[T]he ESA itself does not defer to state water-rights law and contains only the vague statement that it is 'the policy of Congress that Federal agencies shall cooperate with State and local agencies to resolve water resource issues in concert with conservation of endangered species.'  It is therefore unlikely that a deference to state water laws will ever be interpolated into the ESA."); Reed D. Benson, <u>Deflating the Deference Myth: National Interests vs. State Authority under Federal Laws Affecting Water Use</u>, 2006 Utah L. Rev. 241, 308-10 (2006) (The ESA "makes no mention of preserving state water allocation authority; instead, it speaks of resolving water issues in concert with species conservation, indicating that Congress anticipated that issues would arise and that the national interest in protecting endangered species should not simply give way to the interests of states and traditional water users. . . . [T]he ESA mandated a dominant federal role that seems inconsistent with much deference, even if the national interests in . . . species protection incidentally infringe on state water allocation authority.") (internal quotation marks omitted).

IV.     **Conclusion**

For the reasons stated above, the Court DENIES Plaintiff's Motion for Partial Summary Judgment on Standing.  (D.E. 213.)  TCEQ Defendants' Motion for Summary Judgment (D.E. 214), and GBRA's Motion for Summary Judgment (D.E. 215), are also DENIED.

SIGNED and ORDERED this 5th day of December, 2011.

Janis Graham Jack
Senior United States District Judge